[No. 27908. Department Two. July 12, 1941.]

MARY FOWLER ROGERS et al., *Respondents*, v. EVERELL L. CATION et al., *Appellants*.[1]

[1]Reported in 115 P. (2d) 702.

*Lehrer & Marquis* and *Herbert Ringhoffer,* for appellants.

*Cameron Sherwood,* for respondents.

DRIVER, J.—Plaintiffs brought this action to quiet title to an easement to use, on their own land, the waters of a spring arising on the premises of the defendants and to enjoin the latter from interfering with such easement. A trial to the court resulted in a decree in favor of the plaintiffs, and the defendants Everell L. Cation and Olive Ella Cornwell appealed. Pursuant to a stipulation of the parties, the action has been abated as to respondent V. H. Rogers, and Mary Fowler Rogers is now the only respondent.

A shallow valley runs from east to west across the farm lands involved in the controversy. Appellants own the upper easterly tract, and respondents the adjoining, lower westerly one. A small creek, fed by numerous springs arising in marshy ground on the westerly portion of appellants' premises, runs down through the valley and across the land of the respondent. Above the springs, the creek is dry except in the flood season, but below them it maintains a continuous flow. The water which is the subject of the present

action comes from one of the springs on appellants' land several hundred feet up the valley from the common north and south boundary line.

At the time the suit was started in July, 1938, respondent was using the water for domestic and live stock purposes in two dwelling houses and a barnyard watering trough situated just below the boundary line and north of the creek. A pipe line brought the water from the spring by gravity flow and under pressure to the place of use.

All the land was at one time under the common ownership of J. M. Cornwell, who acquired it prior to the year 1875. He died intestate in 1899, and, by agreement of his heirs, it was allocated to his son, A. G. Cornwell, and his daughter, Laura F. Robinson, as tenants in common. When his estate was finally settled in 1902, the land was divided, the son taking the lower (respondent's) tract and the daughter the upper (appellants'). Laura Robinson held hers until her death in 1934. It then passed, by inheritance through an intermediate intestate, to Forrest Cation and appellant Everell L. Cation. In April, 1938, the other appellant, Olive Cornwell, acquired, by purchase, the undivided one-half interest of Forrest Cation. The other, or lower, tract remained in the ownership of A. G. Cornwell from 1902 until he died intestate in 1927, when it descended to his widow, Carrie E. Cornwell. She died in 1931, and the following year her administrator sold it to Oliver T. Cornwell, who was then respondent's husband. Respondent acquired full title upon his death in 1935.

The testimony is sharply in conflict as to when the use of the water began. It was first taken from a natural spring seventy or eighty feet inside the upper tract, and was carried through a flume to a wooden watering trough a short distance below the boundary

line. Some time later, water from the same spring was piped to a small dwelling house on the lower tract. When this was done does not appear, but probably it was not long after the division of the property in 1902. In 1917, A. G. Cornwell razed the dwelling and built a new one in the same location. The new house utilized the identical water system which had served the old one. Another small dwelling house, which had been moved in from a nearby farm, also was attached to the same pipe line. It then became apparent that the water pressure was insufficient, and A. G. Cornwell and his son Elmer, who had established residence in the new house upon its completion early in 1918, decided that they would undertake to develop a more adequate source of supply. How this was accomplished appears from the following testimony of Elmer Cornwell:

"A. I was quite anxious to have a water supply and I talked with my father and we decided to talk with Mrs. [Laura] Robinson. He and I went to her place here in town and I asked her if it would be all right, . . . Q. Go ahead? A. I told her the conditions and what trouble we had with the water and asked her if it would be all right to use this spring in the pasture,—if we were granted that courtesy and she said yes, it would be all right to put the spring there. . . . Q. Now tell what you did about that new spring? A. I got that tile and took it up there and found a good place to put the spring,—the tile drained from this marshy ground into the creek, I did not know the best place to put the tile. Q. When you refer to putting the tile in the ground, that is the big concrete pipe? A. Yes, the one I put in and then there was some small tile for drainage. I started at the end of this small tile and dug a ditch along until I found where the two inch tile began. I figured I would get more water that way. Then I concreted it in for the water supply. And my father located some second hand pipe, I think it was about two inch pipe, and we

took it out to the ranch. I think they sent a wagon in town for it. Then I dug a ditch from this spring down to the square concrete spring. Q. That was what direction from the spring we have talked about? A. That was west toward the buildings. Q. Between the new spring and what? A. And the old one. Q. And the A. G. Cornwell buildings? A. Yes, sir. Q. You dug a ditch through there? A. Yes, and disconnected the lower spring and then we took our water supply from the artificial spring. Q. What did you do about piping from the new spring? A. We disconnected the old spring and connected up with the pipe from the new spring and used it from there down. Q. That was in 1919? A. Yes, sir. Q. The flow of water was then from where? A. From the upper spring. Q. Was the lower spring used then? A. No, never to my knowledge since then. . . ."

From the time the land was divided in 1902, A. G. Cornwell, the owner of the lower land where the water was used, rented the upper tract, which was its source, from its owner, Laura Robinson, and this relationship of tenant and landlord existed without interruption until his death in 1927. After A. G. Cornwell died, his widow continued to rent the Laura Robinson land, but for just how long the record does not show. However, in 1932 and 1933, when the title to the lower tract was in Oliver T. Cornwell, he also rented the upper tract from Mrs. Robinson.

■ The trial court's decree was based upon the conclusion expressed in its memorandum opinion, that an easement had been created by prescription. The burden was upon the respondent to establish an adverse possession for an uninterrupted period of at least ten years. *Skansi v. Novak,* 84 Wash. 39, 146 Pac. 160; *Peoples Savings Bank v. Bufford,* 90 Wash. 204, 155 Pac. 1068; *Downie v. Renton,* 167 Wash. 374, 9 P. (2d) 372.

■ Ordinarily, a tenant can not adversely hold

the real property of his landlord for the purpose of acquiring title by prescription. This elementary principle is succinctly stated in 4 Tiffany, Real Property (3rd ed.), 508, § 1178, as follows:

"Possession for the statutory period by the tenant under a lease is, it is agreed, not ordinarily sufficient to confer title upon him as against his landlord. The tenant's possession, taken under the lease, involves a recognition of the landlord's title in reversion, and is consequently not adverse or hostile to the latter."

A similar statement may be found in 1 Am. Jur. 807, § 32. Also to the same effect are *Doherty v. Matsell*, 119 N. Y. 646, 23 N. E. 994; *Lyebrook v. Hall*, 73 Miss. 509, 19 So. 348; *Carson v. Broady*, 56 Neb. 648, 77 N. W. 80, 71 Am. St. 691.

In the case at bar, the successive owners of the lower tract, which the trial court considered the dominant tenement, were the tenants of Mrs. Robinson, the owner of the upper, servient tract, continuously from 1902 until after 1927, and during the years 1932 and 1933. Consequently, there was no uninterrupted ten-year period during which an adverse possession and use could ripen into title by prescription.

It is not necessary for us to state or consider under what exceptional circumstances a tenant may acquire title by adverse possession against his landlord, because there was no proof of such circumstances in the present case.

█ The respondent advances, as an additional reason why the trial court's decree should be affirmed, the contention that, upon the division of the J. M. Cornwell land, an easement by implication arose.

In *Bailey v. Hennessey*, 112 Wash. 45, 191 Pac. 863, this court stated how easements by implied grant may be created as follows:

"Easements by implication arise where property has been held in a unified title, and during such time an

open and notorious servitude has apparently been impressed upon one part of the estate in favor of another part, and such servitude, at the time that the unity of title has been dissolved by a division of the property or a severance of the title, has been in use and is reasonably necessary for the fair enjoyment of the portion benefited by such use. The rule, then, is, that upon such severance, there arises, by implication of law, a grant of the right to continue such use."

And in *Berlin v. Robbins,* 180 Wash. 176, 38 P. (2d) 1047, we said that the three essential characteristics of an easement by implication are "(1) unity of title and subsequent separation by a grant of the dominant tenement, (2) apparent and continuous user, and (3) the easement must be necessary to the proper or reasonable enjoyment of the dominant tenement." Have these three requirements been met in the present case?

In seeking the answer to this question, we should bear in mind that the rule is not a hard and fast one, and the presence or absence of any or all of the stated requirements is not necessarily conclusive. The cardinal consideration is the presumed intention of the parties concerned as disclosed by the extent and character of the user, the nature of the property, and the relation of the separated parts to each other. 3 Tiffany, Real Property (3rd ed.), 253, 254, § 780; *Bailey v. Hennessey, supra.*

In the case at bar, there had been a unity of title in J. M. Cornwell, and there was a separation at his death, by operation of the law of descent, sufficient to satisfy the first requirement of the rule. *Ellis v. Bassett,* 128 Ind. 118, 27 N. E. 344, 25 Am. St. 421; *Lucas v. Rhodes,* 48 Ind. App. 211, 94 N. E. 914; 19 C. J. 916, § 106(c).

As to whether or not there was any use of the spring water from the upper tract upon the lower land

prior to the separation of title in 1902, the testimony was directly contradictory. According to several of respondent's witnesses, the wooden watering trough was supplied with running water from the old natural spring on the upper portion of the premises as early as 1889; and this trough, or some replacement of it in the same location, was maintained at all times thereafter. On the other hand, a number of appellants' witnesses testified that, prior to the division of the J. M. Cornwell estate, no spring east of the barnyard was used, but that all water for live stock purposes was taken from the creek.

All this testimony was somewhat vague and uncertain, as might well be expected since it pertained to a period approximately forty years before the trial. The lower court did not pass upon the question of easement by implication, but its memorandum opinion contains a general recital that, during the time the premises "were held under the common ownership of J. M. Cornwell, water from the springs on the lands owned by defendants [appellants] was used on the lands now owned by the plaintiff [respondent]."

We are inclined to adopt that conclusion because of the trial court's favored position in passing upon the credibility of the witnesses. Even so, whatever user there was prior to 1902 consisted principally of the watering of live stock at a barnyard trough to which water was brought from a nearby spring through V-shaped wooden flumes or improvised rectangular wooden pipe made of two by six-inch planks. There was some testimony to the effect that, at one time or another, water from this spring was carried in buckets to a portable cookhouse on wheels and to an old dwelling house, but, otherwise, the witnesses on both sides agreed that, before the land was divided, water for household use was taken from a small spring on

the lower tract, across the creek to the south of the dwelling house, or was pumped from a well in the summer kitchen. No water was piped to any dwelling house prior to 1902. The user for live stock purposes was plainly visible or apparent. It was also long continued, but that it was continuous in the sense of indicating an intention to make a permanent adaption of the two portions of the premises for the purpose of the user, seems, to say the least, quite doubtful.

Passing to the third essential element, this court has definitely subscribed to the principle supported by a majority of the courts, that only a reasonable, rather than a strict, necessity is required. We have held that degree of necessity sufficient which makes the easement indispensable to the proper, comfortable, or convenient enjoyment of the property as it existed when the separation occurred. *Bailey v. Hennessey,* 112 Wash. 45, 191 Pac. 863, *supra,* and *Berlin v. Robbins,* 180 Wash. 176, 38 P. (2d) 1047, *supra.* In the latter case, we said: "The test of necessity is whether the party claiming the right can, at reasonable cost, on his own estate, and without trespassing on his neighbors, create a substitute."

What, then, was the situation in the instant case in 1902, when the severance took place? No water had been piped to any dwelling under pressure or otherwise, and water for domestic use had, for the most part, been taken from a spring and a well on the lower part of the premises. The creek which runs through, or alongside of, the barnyard was then only slightly below the adjacent ground level, and one of the witnesses testified that, before the death of J. M. Cornwell, water had been brought from the creek to the watering trough through a pipe on the lower tract. It would seem, therefore, that, upon the separation of title, water was available at the lower estate itself,

without substantial inconvenience or expense, for the same kinds of uses, both household and live stock, which had existed prior to that time.

We repeat that the intention, or, rather, the presumed intention of the parties, is the prime factor in determining whether an easement by implication has been created. In this case, the burden was upon the respondent to prove all the elements which, as we have stated, are ordinarily deemed essential to support such a presumed intention. Careful consideration of the entire record and all the circumstances which it discloses, impels the conclusion that she did not meet the burden of showing that there was such an adaption and use of the land before it was divided as to indicate that J. M. Cornwell or his heirs intended to impose a permanent servitude upon one part of it in favor of the other.

Respondent also contends that appellants are estopped from asserting any right to the water in controversy. *Hollett v. Davis*, 54 Wash. 326, 103 Pac. 423, is cited in support of this contention.

In that case, an upper riparian owner and his predecessor in interest diverted a stream formed by the overflow of a spring from its natural channel to a new course, where it ran for more than thirty years. A lower riparian owner, relying upon its continued flow, had grown an orchard and made other valuable improvements upon his land. It was held that the newer channel should be regarded as the natural one, and that the upper owner was estopped from turning the stream back into its former course.

Clearly, the case is not in point. Here, there was no diversion of a stream by an upper riparian owner. After the division of the land, the upper owners did nothing of an affirmative character. The nearest approach to affirmative action was when Mrs. Robinson,

in 1917, granted the request of her brother and tenant, A. G. Cornwell, that he be permitted to take water from a higher source on her premises to increase the pressure in his domestic water system. Before such permission was given, he had completed the construction of his new dwelling and had fully equipped it with water pipes and plumbing fixtures. We think it is too apparent to require further discussion that, under the circumstances of the present case, estoppel can not be invoked against the appellants to support the trial court's decree.

The decree is reversed, with direction to the superior court to dismiss the action.

BLAKE, BEALS, and JEFFERS, JJ., concur.

STEINERT, J., dissents.

[1]Reported in 115 P. (2d) 718.