[No. 48894-5-I.    Division One.    April 15, 2002.]

GORDON BRUCE MACMEEKIN, *Appellant*, v. LOW INCOME
HOUSING INSTITUTE, INC., *Respondent*.

*Philip E. Hickey*, for appellant.

*Lori Salzarulo* (of *Garvey, Schubert & Barer*), for respondent.

KENNEDY, J. — Gordon Bruce MacMeekin filed suit seeking to quiet title to a claimed nonexclusive easement over property owned by the Low Income Housing Institute (LIHI). LIHI filed a motion for summary judgment, conceding (for purposes of the motion only) that MacMeekin had a prescriptive easement, but claiming that it cannot develop its property without building on the Driveway, and requesting the court to exercise its equity power to relocate the prescriptive easement through another portion of LIHI's property. MacMeekin replied that he had an easement implied from prior use, and argued that even if his easement were acquired by prescription instead, the court

lacked the authority to relocate it. The trial court granted summary judgment to LIHI, concluding that MacMeekin did not have an easement implied from prior use. The trial court also approved LIHI's plan to relocate the easement, concluding that prescriptive easements are subject to court-ordered relocation and that the equities in this case justify relocation. We reverse and remand. Genuine issues of material fact preclude summary judgment on the question of whether MacMeekin has an implied easement from prior use. Moreover, Washington appellate courts have not adopted the approach of *Restatement (Third) of Property: Servitudes* (2000) under which an easement generally may be relocated by the owner of the servient estate, regardless of how the easement was acquired, so long as the relocation will not significantly lessen the utility of the easement, increase the burdens on the owner of the easement in its use and enjoyment, or frustrate the purpose for which the easement was created. We decline to adopt the *Restatement (Third)* approach, and adhere to the traditional rule that easements may not be relocated absent mutual consent of the owners of the dominant and servient estates, regardless of how the easement was created.

## FACTS

In 1948, Mrs. Fine Rossellini Pettofrezzo built a house on property she owned that was given the street address of 3924 Empire Way South (now known as 3924 Martin Luther King Jr. Way South, hereinafter 3924 MLK Way). In order to build the house in that location, Pettofrezzo had to build the 200-foot long Driveway that is the subject of this lawsuit, leading from MLK Way to the site. Pettofrezzo owned the property located on both sides of the Driveway. In 1950, MacMeekin began renting the house from Pettofrezzo. MacMeekin's only means of accessing the rental home was via the Driveway. Water and sewer lines ran from MLK Way alongside or underneath the Driveway and from there, to the rental house.

Pettofrezzo was in the process of platting some of her property in the area. By 1953 she had created a preliminary plat. She built a house on what was to become Lot 10 of the plat, next door to the rental house, and sold it to Leon Hines. The Driveway, and a leg of the Driveway, which had been used during construction of Hines' house, was his only means of ingress and egress. Water and sewer for his house was obtained by way of connection to the lines that served the rental house. Hines' street address became 3920 MLK Way. In order to reach the Driveway from his home, Hines had to traverse property that still belonged to Pettofrezzo.

In 1956 Pettofrezzo recorded the plat, thereby creating Fine Addition, a residential plat comprised of 12 lots. The rental house lay on property that became Lot 11 with the recording of the plat, as did the Driveway. On the north side of the Driveway lay Lot 12 of Fine Addition. And across the Driveway to the south lay another parcel of property belonging to Pettofrezzo, Tract A. Tract A was not part of Fine Addition.

MacMeekin purchased Lot 11 from Pettofrezzo in 1956. As we have noted, on the plat, Lot 11 included the Driveway. But on MacMeekin's deed it did not. Instead, Pettofrezzo retained the Driveway and deeded MacMeekin a 20-foot strip taken from the east end of Lot 9. MacMeekin was aware of this.

A diagram of the plat and Tract A is appended to this opinion (Appendix). It shows Lots 10 and 11, the Driveway leading from MLK Way to Lot 11, and the 20-foot strip leading from the Driveway to what is shown on the plat as Bradford Place, a street ending in a cul-de-sac. Bradford Place was not opened when the plat was recorded—indeed, it was not opened until 1999 when houses were built on Lots 6, 7 and 8 of Fine Addition for the first time. Those lots had no access to a public street until Bradford Place was opened.

For 43 years after MacMeekin purchased Lot 11, his only means of accessing his property was by way of the Driveway. And Hines' and his successors' only means of accessing

Lot 10 was by way of the Driveway, and then by way of a 90-degree turn from the Driveway onto Lot 11, and then all the way across MacMeekin's property to the house on Lot 10.

Hines built a garage on Lot 10 that faced west toward MLK Way. Both MacMeekin and Hines erected their mailboxes at the corner where Hines turned onto MacMeekin's property. MacMeekin placed a pole and street light near that corner, and he regraveled the Driveway at least once at his own expense.

Lot 12 of Fine Addition fronts on MLK Way and was improved with an apartment building in 1962. Pettofrezzo moved from her home, which had been located on Lot 2, into one of these apartments, where she lived until her death in 1970. There is no indication in the record that Pettofrezzo or her successors ever restricted or challenged MacMeekin's use of the Driveway, or that of Hines and his successors. And there is no indication in the record that MacMeekin ever restricted or challenged the right of Hines and his successors to cross his property in order to reach the Driveway.

In early 2001, after the death of Hines' successor, the house on Lot 10 was demolished. The record does not indicate who owns the lot at the present time. MacMeekin, who is quite elderly by now, still lives in the house on Lot 11. He no longer drives, but has visitors who use the Driveway. Daily, Monday through Saturday, an Access bus picks MacMeekin up and takes him to the Veterans Administration Hospital, or shopping, or to Elder House, or to a senior care center for meals and other services—and then takes him back home, all by way of the Driveway. He receives his mail and deliveries, as he always has, by way of the Driveway.

LIHI is a private nonprofit housing organization organized to develop housing for homeless and low-income individuals and families, seniors, and people with special needs. In March 1999, LIHI purchased Tract A. LIHI also purchased the 20-foot strip upon which the Driveway lays,

and then obtained a boundary line adjustment to include the Driveway in Tract A.[1] LIHI purchased Tract A and the Driveway to develop two related projects: a day care, community and social services center for refugee women and their children, and a multifamily affordable housing project. Before purchasing the property, LIHI believed, based on the published City zoning map, that the property was zoned NC-30 (mixed use commercial), and that this zoning designation would support the project. Unfortunately, a few months after closing on the purchase, LIHI discovered that the NC-30 zoning designation had been established as part of a conditional use permit that had expired, and that the City had simply never corrected its zoning map. The correct zoning designation is L-3 (low rise) for the front portion of the property, and SF-5000 (single family) for the back portion. Therefore, LIHI was prevented from developing multifamily housing on the back part of the property as planned.

LIHI tried for more than a year to change the zoning designation back to NC-30, but was met with strenuous community opposition, and the effort was unsuccessful. LIHI then redesigned the project to locate the housing on the front part of the property as permitted in the L-3 zone. However, because the height limitation in an L-3 zone is more restrictive than in an NC-30 zone, the redesigned project can accommodate only 24 housing units, rather than 35 units as originally planned. Moreover, although the original project would have had no impact whatsoever on MacMeekin's use of the Driveway, LIHI says that it now must build on the Driveway in order to fit these 24 units on the front part of the property. According to LIHI, because of various restrictions placed on its private and public funding sources, it is not financially feasible to reduce the number of units below 24 in order to avoid the need to build on the Driveway. LIHI also explains that it is not feasible for it to

---

[1] The record does not indicate when Lot 12 and Tract A were sold by Pettofrezzo or her heirs, nor how many intervening owners may have held the property prior to LIHI's purchase.

sell the property, in that LIHI has expended close to $1 million of public funds on the property, and the market value of the property is only $495,000; thus LIHI would be liable to repay close to $500,000, money which LIHI says it does not have. And because LIHI is a 501(c)(3) tax-exempt entity chartered to build affordable housing, it believes that it cannot recoup its investment by using the property for some other purpose, such as market-rate housing.

LIHI proposed to solve its problem by relocating the Driveway so that it would cross another portion of Tract A (see Appendix showing proposed relocation of easement on Tract A). The relocated driveway would still allow MacMeekin access from MLK Way, but it would originate 73 feet south of the current Driveway, pass through a parking lot, and make three 90-degree turns before reaching MacMeekin's property. MacMeekin refused to accept this proposal, and filed suit to quiet title to a nonexclusive easement for access and utilities over the Driveway, on the alternate theories of easement implied from prior use and easement by prescription.

LIHI moved for summary judgment, conceding, for purposes of the motion only, that MacMeekin had a prescriptive easement, arguing that prescriptive easements are subject to court-ordered relocation, and requesting that the court exercise its equity power to allow LIHI to relocate the driveway.

MacMeekin contested the motion, arguing that he has an easement implied from prior use (which LIHI does not contend is subject to court-ordered relocation) and that even if he has only a prescriptive easement, the trial court lacked the authority to order that it be relocated against his will. He also argues that even if the court did have authority to order relocation of the easement, such relocation would create substantial adverse impacts and loss of value to his property, make it difficult for his visitors, delivery people and bus drivers to find his street address—in sum, that such relocation would be extremely inconvenient for him, and would interfere with his use and enjoyment of his

property—all of which, he contends, the trial court failed to properly take into account.

The trial court rejected MacMeekin's theory of easement implied from prior use, quieted title in the driveway to LIHI, and granted MacMeekin a nonexclusive right of access over LIHI's property along the path proposed by LIHI. MacMeekin appeals.

## STANDARD OF REVIEW

██ An order granting summary judgment is reviewed de novo, with the appellate court performing the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). A motion for summary judgment may be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The court must construe all facts and reasonable inferences in favor of the nonmoving party. *Scott v. Blanchet High Sch.*, 50 Wn. App. 37, 41, 747 P.2d 1124 (1987). Summary judgment should be affirmed only if reasonable minds could reach but one conclusion. *Id.*

## DISCUSSION

### Easement Implied from Prior Use

██ The party seeking to establish an easement implied from prior use generally must establish three key elements: (1) unity of title and subsequent separation by grant of the dominant estate; (2) apparent and continuous user; and (3) the easement must be reasonably necessary to the proper enjoyment of the dominant estate. *Silver v. Strohm*, 39 Wn.2d 1, 5, 234 P.2d 481 (1951); *Bushy v. Weldon*, 30 Wn.2d 266, 269, 191 P.2d 302 (1948). The underlying principle is that a grant of land is impliedly accompanied by all things necessary to its reasonable use and enjoyment. *Id.*

Unity of title and subsequent separation is an absolute requirement. The second and third characteristics are aids to

construction in determining the cardinal consideration—the presumed intention of the parties as disclosed by the extent and character of the user, the nature of the property, and the relation of the separated parts to each other.

*Adams v. Cullen,* 44 Wn.2d 502, 505-06, 268 P.2d 451 (1954); *Evich v. Kovacevich,* 33 Wn.2d 151, 157, 204 P.2d 839 (1949) ("the cardinal consideration upon the question of easement by implication is the presumed intention of the parties concerned"); *Rogers v. Cation,* 9 Wn.2d 369, 379, 115 P.2d 702 (1941) ("the presumed intention of the parties, is the prime factor in determining whether an easement by implication has been created"); *Bailey v. Hennessey,* 112 Wash. 45, 49, 191 P. 863 (1920). "Easements by implication are not favored by the courts because they are in derogation of the rule that written instruments speak for themselves." 1 Wash. State Bar Ass'n, Washington Real Property Deskbook § 10.3(3)(b) (3d ed. 1997).

LIHI contends that the *only* reasonable inference that can be drawn from the fact that Pettofrezzo did not deed the Driveway to MacMeekin, but did deed him the 20-foot strip taken from Lot 9, is that Pettofrezzo intended for MacMeekin to use the Driveway only until Bradford Place was opened, at which time his right to use the Driveway would terminate. By this theory of the case, Pettofrezzo allowed MacMeekin to use the driveway out of "neighborly accommodation" until such time as Bradford Place might be opened. The trial court agreed, and ruled as a matter of law that MacMeekin had no easement implied from prior use, leaving him with (at best) only a prescriptive easement. We disagree.

MacMeekin has provided substantial evidence in support of all three of the elements of an easement implied from prior use. Moreover, his use of the Driveway cannot be viewed in a vacuum; it must be viewed in conjunction with Hines' use of both the Driveway and the leg connecting his property with the Driveway.

First, Pettofrezzo, who owned all the property in what was to become Fine Addition and Tract A, constructed the

Driveway, built the house on what was to become Lot 11, and rented it to MacMeekin. Then, she constructed a leg of the Driveway leading to what was to become Lot 10, built a house and sold it to Hines, and retained ownership of all the surrounding property, including the leg of the Driveway and the rental property. This left Hines with no means of reaching the Driveway except along the leg of the Driveway that had been used in constructing his home. Then, Pettofrezzo reconfigured Lot 11 and sold it to MacMeekin, retaining ownership of Lot 12, Tract A and the Driveway, leaving both Hines and MacMeekin with no means of ingress and egress except by means of the Driveway, and leaving Hines with no means of reaching the Driveway except by using the leg of the Driveway that now crossed MacMeekin's land. Thus, MacMeekin has shown unity of ownership and subsequent separation of not one but two dominant estates, both his own and that of Hines—with MacMeekin's estate being dominant as to the Driveway, and servient as to the leg of the Driveway leading to Hines' house, and with both estates being dominant as to the Driveway.

Second, there had been apparent and continuous use of the Driveway, and of the leg leading from the Driveway to provide access to Lot 10, before and at the time Lot 10 was severed from the rest of Pettofrezzo's property; and there had been apparent and continuous use of the Driveway before and at the time of severance of Lot 11 from the rest of Pettofrezzo's property.

Third, at the time of the severances, it was reasonably necessary for both Hines and MacMeekin to use the Driveway, and for Hines to use the leg leading from his house to the Driveway. At that time, unopened Bradford Place was nothing but a grassy field, and remained so until sometime in 1999.

■ As further evidence that Hines and MacMeekin justifiably expected to continue to use the leg and the Driveway as they had been used before each of their respective estates were severed, and that this is also what Pettofrezzo

intended, Hines and his successors and MacMeekin continued to use these rights of way over the ensuing half century, all without objection from Pettofrezzo and her successors. Moreover, the houses Pettofrezzo built on Lots 10 and 11 had MLK Way street addresses, and there is no indication in the record that the parties intended that, at some indefinite time in the future, they would be expected to change to Bradford Place street addresses.

We observe that although Pettofrezzo might conceivably have intended to extend "neighborly accommodation" to allow MacMeekin to use the Driveway only until Bradford Place was opened, she hardly could have intended to extend such "neighborly accommodation" to Hines on behalf of MacMeekin. After MacMeekin bought Lot 11, it was his land, not that of Pettofrezzo, that Hines had to traverse in order to reach the Driveway. Thus, LIHI's "neighborly accommodation" theory is flawed.

Moreover, the record reflects another reason why Pettofrezzo may have decided not to deed MacMeekin the Driveway, and to deed him the 20-foot strip removed from Lot 9. Insofar as we can ascertain from the record, the leg of the Driveway leading to Lot 10 is located on that 20-foot strip, or at least a part thereof. Evidence in the record reflects that in order to reach his house from the Driveway, Hines made a 90-degree turn to the left (north) and then proceeded across MacMeekin's property. The plat map (Appendix) shows that the 20-foot strip runs directly perpendicular to the Driveway, so that a 90-degree turn from the Driveway would place one on the 20-foot strip. So although it is true that the strip leads from Lot 11 to unopened Bradford Place, it also leads directly from Lot 10 to the Driveway. The record reflects that Hines built his garage facing west toward MLK Way, which means that it also faced the 20-foot strip. A trier of fact could reasonably infer that the 20-foot strip contains the same leg to the Driveway that Pettofrezzo constructed when she built the house on Lot 10, and that Hines built his garage facing the strip so that he could drive his car directly into the garage

when turning off the strip onto Lot 10. We also note from the plat map that Lot 9 lies adjacent to the Driveway, as well as to unopened Bradford Place. Thus it would appear that Pettofrezzo not only intended for Hines to use the leg of the Driveway and for both Hines and MacMeekin to use the Driveway, but also may have intended Lot 9 to use the Driveway and have an MLK Way street address—another possible reason for not deeding the Driveway to MacMeekin in fee.

■ All of these inferences must be viewed in the light most favorable to MacMeekin for purposes of summary judgment. It cannot be said as a matter of law that there is only one reasonable inference that can be drawn from the evidence. The trial court erred in dismissing MacMeekin's claim for easement implied by prior use.

## Court-Ordered Relocation of Easement

Washington appellate courts have not heretofore directly addressed the question of whether a court may order relocation of an established easement against the will of the owner of the dominant estate. The traditional rule at common law is that easements cannot be altered without the express consent of both parties. 25 Am. Jur. 2d *Easements and Licences* § 79 (1996); F.M. English, Annotation, *Relocation of Easements (Other Than Those Originally Arising By Necessity)*; *Rights As Between Private Parties*, 80 A.L.R.2d 743 § 4 (1961). The majority of courts that have addressed the issue have held that they lack the equitable authority to order relocation of an easement, even if the change is necessary to one estate and would not inconvenience the other. Most of these cases address express easements. For example, in *Adair v. Kona Corp.*, 51 Haw. 104, 452 P.2d 449, 455 (1969), the court held that it can exercise its equitable power only to locate an easement where it is not definitively located in the grant and the parties fail to agree on its location. In *Fla. Power Corp. v. Hicks*, 156 So. 2d 408, 410 (Fla. Ct. App. 1963), the court

held that it lacked the equitable authority to modify an express easement grant for construction and maintenance of power lines, noting that the easement was a property right. In *Davis v. Bruk*, 411 A.2d 660, 664-66 (Me. 1980), the court reasoned that judicial relocation of established easements would introduce uncertainty in real estate transactions. *See also Edgell v. Divver*, 402 A.2d 395, 397-98 (Del. Ch. 1979); *Daviess-Martin County REMC v. Meadows*, 179 Ind. App. 622, 386 N.E.2d 1000, 1002 (1979); *Swenson v. Strout Realty, Inc.*, 85 Nev. 236, 452 P.2d 972, 974 (1969); *Jones v. Edwards*, 219 Or. 429, 347 P.2d 846, 850 (1959); *Hamilton v. Transcon. Gas Pipe Line Corp.*, 236 Miss. 429, 110 So. 2d 612 (1959); *Youngstown Steel Prods. Co. v. City of L.A.*, 38 Cal. 2d 407, 240 P.2d 977, 979 (1952); *Stamatis v. Johnson*, 72 Ariz. 158, 231 P.2d 956 (1951); *Tripp v. Bagley*, 74 Utah 57, 276 P. 912 (1928); *Naumkeag Steam Cotton Co. v. Am. Glue Co.*, 244 Mass. 506, 139 N.E. 296 (1923); *Manning v. Port Reading R.R.*, 54 N.J. Eq. 46, 33 A. 802 (Ch. 1896); *Sakansky v. Wein*, 86 N.H. 337, 169 A. 1, 3 (1933); *Smith v. Jackson*, 180 N.C. 115, 104 S.E. 169 (1920). One case directly addressing prescriptive easements is *Thomason v. Kern & Co.*, 259 Ga. 119, 376 S.E.2d 872 (1989), where the court reasoned that just as one who would establish a prescriptive easement cannot shift its path during the establishment period, so the servient estate cannot move the easement once established.

Dictum in several Washington cases supports Mac-Meekin's argument that the general rule should apply to nonconsensual relocation of easements in Washington, whether acquired by prescription or by any other means. In *Coast Storage Co. v. Schwartz*, 55 Wn.2d 848, 351 P.2d 520 (1960), the servient estate sought to relocate an express easement over another portion of its property, asserting that the dominant estate had consented to the shift. The court held that the dominant estate, and its predecessors in interest, did not consent to relocation by means of a letter written by the predecessors after they no longer had any interest in the tract and which, at best, stated that they did

not object to any arrangements to which the parties might agree. *Id.* at 854-55. The servient estate admitted, and the court agreed, that "the consent of all interested parties is prerequisite to the relocation of an easement." *Id.* at 854. Thus, the parties did not dispute whether consent was necessary, but whether the necessary consent had been obtained.

In holding that the respondent's adverse use created a prescriptive easement, the court in *Northwest Cities Gas Co. v. Western Fuel Co.*, 13 Wn.2d 75, 88, 123 P.2d 771 (1942) noted in passing that a prescriptive right, once acquired, cannot be terminated or abridged at the will of the owner of the servient estate.

In *White Bros. & Crum Co. v. Watson*, 64 Wash. 666, 670, 117 P. 497 (1911), the servient estate sought to transport water to the dominant estate via dam and pipeline rather than ditch and flume. In holding that no change could be made in the character of the servitude, the court observed that

> [i]f it is something in which he has the actual right of property there is no rule of law nor principle of equity which would warrant a court in taking it from him against his will or for the benefit of another. No amount of hardship in a given case would justify the establishment of such a precedent.

*Id.* at 671.

In *State ex rel. Northwestern Electric Co. v. Superior Court*, 28 Wn.2d 476, 488, 183 P.2d 802 (1947), which dealt with express electricity easements, the court noted that " '[w]hen the right granted has been once exercised in a fixed and defined course, with the full acquiescence and consent of both parties, it cannot be changed at the pleasure of the grantee' " (quoting *Jennison v. Walker*, 77 Mass. (11 Gray) 423, 426 (1858)).

LIHI relies heavily on *Soderberg v. Weisel*, 455 Pa. Super. 158, 687 A.2d 839 (1997) in support of its argument that Washington courts should have the equitable power to relocate prescriptive easements, if none other. In *Sod-*

*erberg*, the servient estate sought to relocate an access easement for safety purposes, but the dominant estate rejected the proposed relocation. The court held that it "may compel relocation of an easement if that relocation would not substantially interfere with the easement holder's use and enjoyment of the right of way and it advances the interests of justice." *Id.*, 687 A2d at 844. The court acknowledged the general rule that easements cannot be relocated without the consent of both parties, but relied on Pennsylvania precedent establishing that a servient estate may relocate a prescriptive easement where the resulting easement is as safe as the original, results in a relatively minor change, and the reason for relocation is substantial.[2] *Id.* at 842. However, the court cautioned that "ordering relocation is an extraordinary remedy and should be used sparingly." *Id.* at 844.

LIHI also relies on *Umphres v. J.R. Mayer Enterprises, Inc.*, 889 S.W.2d 86 (Mo. Ct. App. 1994). In that case, the owner of the servient estate unilaterally relocated a prescriptive roadway easement. The court noted the traditional rule that easements cannot be changed without the consent of all parties, and concluded that the dominant estate had suffered a legal wrong. *Id.* at 90. However, the court refused to order the owner of the servient estate to move the easement back to its original location, and instead granted monetary damages to the owner of the dominant estate. In so holding, the court noted that the dominant estate was not substantially harmed by relocation, whereas the servient estate would suffer hardship if the easement were returned to its original location. *Id.*

Similarly, in *Brown v. Bradbury*, 110 Colo. 537, 135 P.2d 1013 (1943), the court refused to compel the servient estate to return a ditch to its original location, where the damage to the dominant estate was insignificant, the harm to the

---

[2] The court noted that prescriptive easements differ significantly from express easements, in that prescriptive easements are not fixed by agreement between the parties or their predecessors, and because express easements are subject to contract principles and are more difficult to alter. *Soderberg*, 687 A.2d at 843.

servient estate was significant, and the new ditch was equal in efficiency to the old one.

And in *Kline v. Bernardsville Ass'n*, 267 N.J. Super. 473, 631 A.2d 1263, 1267 (1993), the court said that "a court may compel relocation of an easement to advance the interests of justice where the modification is minor and the parties' essential rights are fully preserved." The *Kline* court noted that relocation without mutual consent is "an extraordinary remedy and should be grounded in a strong showing of necessity." *Id.* Other cases approving unilateral or court-ordered relocation or modification include *Millson v. Laughlin*, 217 Md. 576, 142 A.2d 810, 814 (1958); *Cozby v. Armstrong*, 205 S.W.2d 403, 408 (Tex. Civ. App. 1947); *RFS, Inc. v. Cohen*, 772 S.W.2d 713, 716-17 (Mo. Ct. App. 1989) ("so long as the dominant estate receives all of the uses that it bargained for and is entitled to under the easement, equity will not restrict the free and full utilization of the servient estate"); *Sedillo Title Guar., Inc. v. Wagner*, 80 N.M. 429, 457 P.2d 361, 363-64 (1969); *Stewart v. Compton*, 549 S.W.2d 832, 833 (Ky. Ct. App. 1977); *Brian v. Bowlus*, 399 So. 2d 545, 549 (La. 1980).[3]

The *Restatement (Third) of Property: Servitudes* (2000) adopts the minority view espoused by LIHI. Section 4.8(3) of *Restatement (Third)* provides:

> *Unless expressly denied by the terms of an easement, . . . the owner of the servient estate is entitled to make reasonable changes in the location or dimensions of an easement, at the servient owner's expense, to permit normal use or development of the servient estate, but only if the changes do not*
>
> *(a) significantly lessen the utility of the easement,*
>
> *(b) increase the burdens on the owner of the easement in its use and enjoyment, or*
>
> *(c) frustrate the purpose for which the easement was created.*

---

[3] It should be noted that Kentucky and Louisiana have statutes expressly permitting relocation of easements and thus are of very limited precedential value in this state.

(Emphasis added.) The provision applies to express easements as well as those acquired by implication or prescription. Comment f explains that this subsection adopts the civil law rule that is in effect in Louisiana and a few other states, and rejects the rule espoused by the weight of authority in this country—that the owner of the servient estate may not unilaterally relocate an easement. By way of further explanation:

> This rule is designed to permit development of the servient estate to the extent it can be accomplished without unduly interfering with the legitimate interests of the easement holder. It complements the rule that the easement holder may increase use of the easement to permit normal development of the dominant estate, if the increase does not unduly burden the servient estate. . . . This rule is not reciprocal. It permits unilateral relocation only by the owner of the servient estate; it does not entitle the owner of the easement to relocate the easement. The reasons for the rule are that it will increase overall utility because it will increase the value of the servient estate without diminishing the value of the dominant estate and it will encourage the use of easements and lower their price by decreasing the risk the easements will unduly restrict future development of the servient estate. In addition, permitting the servient owner to change the location under the enumerated circumstances provides a fair trade-off for the vulnerability of the servient estate to increased use of the easement to accommodate changes in technology and development of the dominant estate.

RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.8 cmt. f.

Section 7.10 of *Restatement (Third) of Property* discusses modification and termination of servitudes because of changed conditions, and provides in subsection (2) that "[i]f the purpose of a servitude can be accomplished, but because of changed conditions the servient estate is no longer suitable for uses permitted by the servitude, a court may modify the servitude to permit other uses under conditions designed to preserve the benefits of the original servitude." RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 7.10(2). Comment (a) to this section indicates that this rule applies to ease-

ments as well as covenants, and permits a party seeking relief from the servitude to petition the court at the point of need.

The reform movement espoused by *Restatement (Third)* generated considerable academic debate over the years, as the American Law Institute issued various tentative drafts. Professor Uriel Reichman, in discussing the changed conditions doctrine (which terminology the *Restatement (Third)* uses both for easements and restrictive covenants) praises the doctrine for introducing a necessary element of flexibility as well as the means to control servitudes that would otherwise result in inefficient land use. *See* Uriel Reichman, *Toward a Unified Concept of Servitudes*, 55 So. CAL. L. REV. 1177, 1259 (1982); *see also* Douglas B. Harris, Note, *Balancing the Equities: Is Missouri Adopting a Progressive Rule for Relocation of Easements?*, 61 Mo. L. REV. 1039 (1996). Others have criticized the doctrine on the ground that it permits undue interference with property rights. *See* Carol M. Rose, Comment, *Servitudes, Security, and Assent: Some Comments on Professors French and Reichman*, 55 So. CAL. L. REV. 1403, 1404 (1982); Richard A. Epstein, Comment, *Notice and Freedom of Contract in the Law of Servitudes*, 55 So. CAL. L. REV. 1353, 1358 (1982); *see also* Note, *The Right of Owners of Servient Estates to Relocate Easements Unilaterally*, 109 HARV. L. REV. 1693 (1996). As noted by the commentator in the *Restatement*, "Rose reminds us the [neighborhood] holdout is not necessarily a rascal, and that the right to hold out is an important aspect of property ownership, normally relaxed only through an eminent domain proceeding. 'If we are to take servitudes seriously as property rights then the neighbors' holdout is perfectly legitimate.' " RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 7.10 Rationale, cmt. a. (quoting Carol M. Rose, *Servitudes, Security, and Assent, supra*, at 1412).

Clearly, the debate between those who would adhere to the traditional rule and those who favor the reform approach involves serious questions of competing policy. The traditional approach favors uniformity, stability, predictability and property rights. The *Restatement (Third)* ap-

proach favors flexibility, and the development potential of the servient estate. Under the traditional approach, the holder of the servient estate must purchase the right to relocate the easement if he is to have it at all. Under the *Restatement (Third)* approach, relocation may be forced upon the holder of the dominant estate against his will. To use the example suggested by this case, under *Restatement (Third)* a court might order relocation of an easement based on its determination that (1) a zig-zag course through the parking lot of an adjacent apartment complex is not significantly different from a straight driveway that has existed for half a century, because both eventually arrive at the same public street, and, therefore, such relocation will not significantly lessen the utility of the easement; (2) even though such relocation might make it difficult for visitors, delivery people, postal authorities, firefighters, bus drivers or others to locate the street address of the dominant estate, this is merely an inconvenience that does not sufficiently increase the burdens on the owner of the easement in its use and enjoyment to justify denial of relocation; and (3) because the easement was created for the purpose of providing ingress, egress and utilities, all of which can still be provided, though perhaps not as conveniently as before, there has been no frustration of purpose.[4]

Under the *Restatement (Third)* approach, one who purchases property in reliance on an existing easement, however created—by express grant, by implication or by prescription—must bargain for a clause prohibiting relocation of the easement, or accept the possibility that the easement may be relocated for purposes that benefit the servient estate, at some time in the future. RESTATEMENT (THIRD), *supra*, § 4.8(3).

In contrast to the traditional rule that Supreme Court dictum indicates applies in Washington, LIHI argues that

---

[4] Unlike the *Restatement (Third)* approach, article 748 of the Louisiana Civil Code Ann. (West 1980) provides that the owner of the servient estate "may do nothing tending to diminish or make more inconvenient the use of the servitude." An owner of the servient estate who wishes to relocate an easement must "provide another equally convenient location for the exercise of the servitude."

*Hughes v. Boyer*, 5 Wn.2d 81, 90, 104 P.2d 760 (1940) lends general support to the notion that prescriptive easements, at least, may be judicially altered where property conditions have changed so as to interfere with the enjoyment of the easement as originally established. In *Hughes*, after a state road-widening project rendered a prescriptive easement for a roadway unusable, the servient estate sought to prevent the dominant estate from regrading the easement to make it usable once again. The court permitted the regrading, stating that " '[i]f the condition of the surrounding property is subsequently changed by lawful authority so as to interfere with the enjoyment of the easement, [the easement holder] may make such alterations as will render it effectual under the new conditions.' " *Id.* at 90 (quoting 19 C.J. 983). We fail to see that this case lends even general support to the notion that our Supreme Court would favor relocating an easement that still serves its intended purpose, for the economic benefit of the servient estate.

■ We decline to adopt the *Restatement (Third)* approach. We also decline LIHI's invitation to rule that trial courts have the authority to order relocation of easements created by prescription, if none other, based on equitable principles. Although our Supreme Court has never directly addressed the issue of court-ordered relocation of easements, and we can be guided only by its pronouncements of dicta, the dictum contains every indication that Washington adheres to the traditional rule that easements, however created, are property rights, and as such are not subject to relocation absent the consent of both parties. We so hold.

## CONCLUSION

We reverse the trial court's order of summary judgment quieting title to the Driveway in LIHI, ordering relocation of the easement, and dismissing MacMeekin's claim of easement by implication from prior use. We remand for such further proceedings as shall be consistent with this opinion.

GROSSE and AGID, JJ., concur.