# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ANNETTE ANDERSON, )<br><br>Appellant, )<br><br>v. )<br><br>THYSSENKRUPP ELEVATOR )<br>CORPORATION, )<br><br>Respondent. )<br>_____ ) | DIVISION ONE<br><br>No. 74655-3-I<br><br>UNPUBLISHED OPINION<br><br>FILED: May 1, 2017 |

DWYER, J. — Annette Anderson was injured when the elevator she was using dropped several floors and came to a sudden stop. Anderson filed suit against ThyssenKrupp Elevator Corporation (TKE), alleging that her injury was caused by TKE's negligent maintenance of the elevator. The trial court granted summary judgment in favor of TKE. On appeal, Anderson contends that genuine issues of material fact remain as to whether TKE was negligent. Finding no error, we affirm.

I

Anderson's place of employment, the Boeing Park Plaza Building 10-18, houses four passenger elevators and one freight elevator. These four passenger elevators were installed in 1987 and modernized in 2009 with the installation of controller systems, including ICE-CPT boards (often referred to as CPT boards).[1]

---

[1] Tim Moore, a licensed elevator mechanic working for TKE, described the controller as "essentially the brains of the elevator [that] generally consists of a large computer system located

A CPT board is essentially a maintenance-free "black box." CPT boards are not serviceable by mechanics in the field and the failure of a CPT board cannot be discerned until after the microprocessor sealed inside has already begun to fail.

TKE began servicing the elevators in building 10-18 in October of 2010. TKE services these elevators in two distinct ways. First, TKE provides prescheduled maintenance and testing services, which includes examination of the elevators and related equipment, cleaning and lubrication of equipment parts, and minor adjustments and repairs to the equipment. Second, TKE responds to "call backs"—service calls made by the building owners in response to operating problems with the elevators. A call back may also be in response to one or more passengers becoming trapped inside of an elevator.

TKE has maintained records of the routine maintenance performed and call backs received for the elevators in building 10-18 since it began servicing these elevators.[2] These maintenance records establish that, from October 2010 until October 20, 2011, elevator #1 received 12 call backs, elevator #2 received 5 call backs, elevator #3 received 12 call backs, and elevator #4 received 6 call backs.

On October 21, 2011, Anderson entered elevator #2 in building 10-18 on the seventh floor. As the elevator was descending, it experienced an issue with the CPT board causing it to drop rapidly and then stop abruptly before reaching

---

in the roof-top machine room and also several circuit boards at different locations, including three on top of each elevator car. One of the three circuit boards on the car top is an ICE-CPT board."

[2] There are no records available for the period of time between March 2012 and December 2012—a nine-month period of time occurring *after* the malfunction that caused Anderson's injury.

the first floor. Anderson remained trapped inside the elevator for several minutes after the drop until the elevator resumed operating and opened on the first floor. The rapid dropping and sudden stopping of the elevator injured Anderson.

The Anderson incident occurred on a Friday. TKE was not notified of the elevator's malfunction at that time. Rather, Richard Preszler—TKE's mechanic—discovered that elevator #2 was malfunctioning during a routine inspection of the elevators over the ensuing weekend. Preszler noticed that elevator #2 was stuck between floors but he could not immediately determine the cause of the malfunction. Preszler returned on Monday, examined elevator #2 again, and determined that there might be an issue with the CPT board. Preszler contacted the manufacturer of the CPT board and determined that the safety output circuit on the CPT board was not activating properly. The only remedy was for the manufacturer to send a new CPT board to replace the one with the bad output circuit.

Preszler replaced the CPT board on elevator #2 on November 1, 2011. The following day, a state inspector tested elevator #2 and determined that the elevator was safe to resume service. TKE had been notified of Anderson's injury on October 25, 2011. TKE concluded that the failure of the CPT board caused the incident involving Anderson.

Anderson filed suit against TKE in October 2014, alleging that her injuries were caused by TKE's negligent maintenance of elevator #2. TKE moved for summary judgment, arguing that the incident that caused Anderson's injuries was

not reasonably foreseeable. The trial court granted the motion for summary judgment. Anderson timely appealed.

II

A

Anderson contends that the trial court erred by granting summary judgment in favor of TKE. This is so, she asserts, because genuine issues of material fact remain as to whether TKE negligently maintained the elevator. We disagree.

We review de novo a trial court's order granting summary judgment, performing the same inquiry as the trial court. MacMeekin v. Low Income Hous. Inst., Inc., 111 Wn. App. 188, 195, 45 P.3d 570 (2002). An order granting summary judgment may be entered when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); MacMeekin, 111 Wn. App. at 195. In reviewing a summary judgment order, we view the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Holmquist v. King County, 182 Wn. App. 200, 207, 328 P.3d 1000 (2014).

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If the defendant is the moving party, that burden may be met by demonstrating that there is an absence of evidence to support the nonmoving party's case. Howell v. Spokane & Inland Empire Blood Bank, 117

Wn.2d 619, 624, 818 P.2d 1056 (1991) (citing Young, 112 Wn.2d at 225). Once that burden is met, the burden shifts to the plaintiff to set forth specific facts showing that there is a genuine issue for trial. Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359, 753 P.2d 517 (1988). The party opposing a motion for summary judgment "may not rely on speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value." Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

A plaintiff asserting negligence must show "'(1) the existence of a duty owed, (2) breach of that duty, (3) a resulting injury, and (4) a proximate cause between the breach and the injury.'" Iwai v. State, 129 Wn.2d 84, 96, 915 P.2d 1089 (1996) (quoting Tincani v. Inland Empire Zoological Soc'y, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994)). The duty owed by a contracted elevator repair company is one of reasonable care in maintaining the elevators. Pruneda v. Otis Elevator Co., 65 Wn. App. 481, 487-88, 828 P.2d 642 (1992).

"The question of duty encompasses the concept of foreseeability." Maltman v. Sauer, 84 Wn.2d 975, 980, 530 P.2d 254 (1975). Although the concept of foreseeability may be considered a factor of proximate cause, "it is more appropriately attached to the issues [of] whether defendant owed plaintiff a duty, and, if so, whether the duty imposed by the risk embraces that conduct which resulted in injury to plaintiff." Rikstad v. Holmberg, 76 Wn.2d 265, 268, 456 P.2d 355 (1969). "[T]he harm sustained must be reasonably perceived as being within the general field of danger covered by the specific duty owed by the

defendant." Maltman, 84 Wn.2d at 981. "'Foreseeability is normally an issue for the jury, but it will be decided as a matter of law where reasonable minds cannot differ.'" McKown v. Simon Prop. Grp., Inc., 182 Wn.2d 752, 763, 344 P.3d 661 (2015) (quoting Christen v. Lee, 113 Wn.2d 479, 492, 780 P.2d 1307 (1989)).

Here, the parties do not dispute that Anderson was injured on October 21, 2011 or that her injury was the result of elevator #2's malfunction. Rather, the dispute turns on whether the incident was reasonably foreseeable and, thus, within the scope of the duty owed by TKE.

B

Anderson contends that the elevator malfunction that resulted in her injury was reasonably foreseeable. This is so, she asserts, because elevator #2 had already experienced an excessive number of malfunctions prior to the Anderson incident, placing TKE on notice of a potential problem with the elevator.

Dr. Stephen Carr provided deposition testimony as Anderson's elevator expert in this matter. Carr testified that he agreed with TKE's conclusion that the failure of the CPT board caused the incident that injured Anderson. Carr testified that CPT boards can fail without notice—either a "hard failure" or an intermittent failure (where they are "down some, up some"). Carr testified that CPT boards are not repairable in the field.

Carr also testified as to his opinion regarding the five call backs that TKE received for elevator #2 prior to the Anderson incident. All of these call backs were for issues pertaining to the elevator doors. Carr testified that, as to each call back that TKE received for elevator #2, none gave TKE notice that there may

have been an issue with the CPT board.  Nevertheless, Carr opined that elevator #2 did experience problems with the CPT board both before and after the Anderson incident.  However, Carr did not elaborate or identify any such incidents.

In light of Carr's deposition testimony, TKE moved for summary judgment.  In support of its motion, TKE submitted the declaration of its own elevator expert, Chuck Bigler.  Bigler agreed with Carr's assessment, concluding that the cause of the Anderson incident was the failure of the CPT board.  Bigler also gave his opinion as to the other five call backs for elevator #2.

> Based on my evaluation of this case, none of the five callbacks for elevator no. 2 in the year before Ms. Anderson's incident involved the ICE-CPT car top board.  These five incidents all related to problems with the elevator door hardware or software.  This is consistent with my experience as an elevator mechanic.  Elevator doors open and close each time an elevator is called.  These doors also interact with the public and consequently get struck by people or their belongings, held open by people beyond normal closing time or obstructed from closing by debris or other impediments in the doorway.  All of this combines to make doors the most common reason for elevator callbacks and needed maintenance.

Bigler further opined that five call backs during the first 12 months was to be expected for an elevator with high usage, such as elevator #2, and that five call backs was consistent with good maintenance.

Carr's deposition testimony and Bigler's declaration revealed an absence of evidence supporting Anderson's case.  If the failure of the CPT board was not foreseeable—and it was the failure of the CPT board that caused the incident that injured Anderson—then prevention of the Anderson incident falls outside of

-7-

the scope of the duty owed by TKE. Accordingly, the burden returned to Anderson to set forth specific facts showing a genuine issue for trial.

In response to TKE's motion for summary judgment, Anderson submitted Carr's declaration. Carr's ultimate opinion as to the Anderson incident was as follows:

> The accident in the Anderson case was triggered by a manufactured electronic circuit board known as the CPT . . . . The failure of this board could not be predicted or repaired in the field. However, the response of the elevator to the failure of the board is certainly predictable. The board caused an unplanned stop and the result was not good for Annette Anderson.
>
> . . . The evidence shows that the failure of the CPT board, attached to elevator #2, which caused an unplanned stop for Ms. Anderson, was due to an intermittent failure. These intermittent problems of the CPT board on elevator #2 would cause the safety circuit to open on occasion and cause the elevator to come to an unplanned stop. Given this, it is clear that the CPT board failure in this case was not a "spontaneous event" with no prior warning to the Defendant.

Carr's declaration fails to establish a genuine issue of fact for trial. First, Carr repeats his concession that the failure of the CPT board—which caused the Anderson incident—could not have been predicted. Carr then attempts to deemphasize that fact by concluding that the response of the elevator *to the failure of the CPT board* is predictable. But Carr's conclusion is a non-sequitur. The issue here is not whether TKE could have predicted how the elevator would behave *upon the failure* of the CPT board but, rather, whether the failure itself was reasonably foreseeable and within the scope of the duty owed by TKE.

Carr next concludes that the failure of the CPT "was not a 'spontaneous event' with no prior warning". As discussed herein, Carr previously testified that

the call backs for elevator #2 prior to the Anderson incident were neither related to the CPT board nor gave TKE notice that there may be an issue with the CPT board. Rather, the only evidence in the record relating to the failure of the CPT board establishes that the Anderson incident was the *first* occasion in which the CPT board experienced a malfunction. The malfunctioning of elevator #2 over the two days following the Anderson incident, as discovered by Preszler, indicates that the CPT board was experiencing intermittent failure *beginning with the Anderson incident.*[3] Carr's statement to the contrary is merely an argumentative assertion without any further explanation or support in the record.

Carr's declaration also discusses what he considers to be the negligent behavior of elevator repair companies *in general.* Carr states that "[t]he elevator industry's principal maintenance problem is that the age of the parts are not accounted for and are not replaced at prearranged intervals. The equipment is simply operated until failure occurs. This behavior is blatantly negligent." But Carr never asserts that TKE operated in this fashion or that the age of the parts was a factor in the failure of elevator #2's CPT board. Indeed, the record establishes that CPT boards are expected to work properly for at least 10 years—far longer than the 2 years that elevator #2's CPT board lasted before failing.

---

[3] TKE has twice characterized the problems with elevator #2 as an "intermittent" problem—once in answers to interrogatories and once in Preszler's incident report. However, the context of these characterizations makes it clear that elevator #2 was experiencing intermittent failure *after* the Anderson incident, not prior to the incident. There is no evidence in the record of any such failure prior to the Anderson incident.

Carr's declaration also states that TKE "made no emergency stop-tests of any kind" during the first year that they maintained the elevators. Thus, he concludes, TKE "did not observe the problem beforehand because they did not look for it." Again, Carr's conclusion is contrary to his previous statement that the failure of the CPT board *could not be predicted*. Although he laments the failure of TKE to perform emergency stop tests, he never explains *how* emergency stop tests could warn TKE of an issue with the CPT board. By his own admission, they could not.

Finally, Carr's declaration states that TKE negligently maintained *all* of the elevators in building 10-18. As a preliminary matter, this assertion is based, in part, on numbers that Carr assumed. In his declaration, Carr provides a table purporting to show the total number of call backs and entrapments for all four passenger elevators during 2010 and 2011. However, the only evidence in the record of call backs comes from TKE's own maintenance records—which date back to October of 2010. Because there are no records of maintenance or call backs received prior to TKE's involvement with these elevators, Carr "annualized" (i.e., assumed) the numbers to account for 9 months of nonexistent records.[4]

In light of the total number of call backs for all four passenger elevators—a significant portion of which were assumed—Carr opines that "the excessive

_____

[4] Moreover, even the numbers that Carr provided for 2011 call backs—drawn directly from the maintenance records—are wrong. A review of the maintenance records shows that the actual number of call backs for elevator #2 is six (not seven, as stated in the declaration). Additionally, Carr seems to have counted incidents where passengers became stuck as both an "entrapment" and a call back, causing his numbers to be inflated.

number of problems with all the elevators in the bank of four[] is indicative of the negligent maintenance as performed by [TKE]. More and better testing beforehand and the Anderson accident might never have happened." But Carr does not explain how "more and better testing" could have either prevented the Anderson incident or put TKE on notice that such an incident might occur. Moreover, the only evidence in the record relating to the other passenger elevators in building 10-18 establishes that elevator #2 was the only elevator to experience a problem with its CPT board since installation.[5]

Argumentative assertions unsupported by the record are insufficient to establish legitimate issues for trial. Seven Gables Corp., 106 Wn.2d at 13. Because Carr's declaration contains merely conclusory allegations that are unsupported by facts in the record, it does not create an inference that the Anderson incident was reasonably foreseeable. Cho v. City of Seattle, 185 Wn. App. 10, 20, 341 P.3d 309 (2014), review denied, 183 Wn.2d 1007 (2015). Accordingly, summary judgment in favor of TKE was appropriate. There was no error.[6]

---

[5] Anderson emphasizes that the relays to the CPT board on elevator #1 were replaced in November 2010. However, the record establishes that the actual CPT board on elevator #1 has experienced no documented issues and has not been replaced since its installation. Anderson offers no explanation as to how replacement of the CPT board relays on elevator #1 acted to place TKE on notice of a potential issue with the CPT board on elevator #2.

[6] The parties also dispute the relevance of a state certification that elevator #2 was inspected and safe for public use. Elevators in Washington are inspected a minimum of once per year by the Department of Labor and Industries. RCW 70.87.120(2)(a). Pursuant to RCW 70.87.020(3), "In any suit for damages allegedly caused by a failure or malfunction of the conveyance, conformity with the rules of the department is prima facie evidence that the conveyance work, operation, and inspection is reasonably safe to persons and property."

Although the state certification may serve as a bar to a grant of summary judgment in favor of Anderson—an issue we do not decide—prima facie evidence that elevator #2 was safe for public use does not inform our analysis herein.

Affirmed.

_D. uyu, J_

We concur:

_Trickey, A CT_     _Cox, J._