IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| TOM G. LUTZ and KAREN LUTZ, husband and wife, | ) ) ) | No. 32878-3-III |
| Respondents, | ) ) | |
| v. | ) ) | |
| LISA A. BUFFINGTON and JOHN DOE BUFFINGTON, husband and wife, and The ESTATE OF DENNIS H. LEMLER and/or his heirs, and SETH LEMLER, and TONI LEMLER, husband and wife, and SCHUYLER LEMLER and JANE DOE LEMLER, husband and wife, and ALL OTHER PERSONS OR PARTIES UNKNOWN Claiming Any right, Title, Estate, Lien or Interest in the Real Estate Described in this Complaint, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Appellants. | ) | |

SIDDOWAY, C.J. — After Lisa Buffington successfully sued to invalidate an

express easement over the northern tip of her property that Tom and Karen Lutz had

relied on for access to their land for almost 10 years, the Lutzes brought this action under RCW 8.24.030, asking the court to declare a private way of necessity. Following a bench trial, the court granted the Lutzes' requested relief conditioned upon their payment to Ms. Buffington of $12,430 for the taking and as severance damages, together with $35,911 in attorney fees and costs. The Lutzes satisfied the judgment.

Ms. Buffington appeals, arguing that the Lutzes' present action was a compulsory counterclaim in her earlier action and is barred by their failure to assert it, that the Lutzes failed to name as necessary parties other owners of property in the residential development where Ms. Buffington lives, that the Lutzes did not establish reasonable necessity, that they should have been denied relief on account of undue delay in seeking it, and that the compensation awarded for the taking was insufficient. We find no error or abuse of discretion and affirm. We award Ms. Buffington her reasonable fees and costs on appeal reduced by 30 percent to account for the extent to which unmeritorious assignments of error unnecessarily contributed to the cost of the appeal.

## FACTS

Ponderosa Park is a subdivision near Goldendale in Klickitat County. It is divided into parcels of about five acres in size. Private roads serve the subdivision.

2

In 1973, Tom and Karen Lutz purchased 10 acres of property adjacent to Ponderosa Park, known as lot 113. Lot 113 had no roadway access. The Lutzes reached the property on foot by using a walking path from a road within Ponderosa Park.

In March 1996, Ponderosa Parcels, Inc. (PPI), the developer of Ponderosa Park, entered into a real estate contract to sell lot 82 to Lisa Buffington and her now deceased husband, Dennis Lemler. The real estate contract was recorded with the Klickitat County auditor later that month.

Six months later, in September 1996, the Lutzes purchased lots 110 and 112 from Ernest and Jean Brokaw.[1] The two lots were outside of but adjacent to Ponderosa Park, were adjacent to lot 113, and also lacked access. In connection with this purchase, Mr. Lutz negotiated for access with W. Kershaw, a principal of PPI and its then-president. Coincident with the Lutzes' purchase of the two parcels, PPI executed a grant of easement, granting to the Lutzes a nonexclusive perpetual easement "for the use of all roads located within all recorded Plats of the Ponderosa Park." Clerk's Papers (Oct. 23, 2014) (CP) at 68. Since the terminus of the closest private road to the Lutzes' property

---

[1] The statutory warranty deed described the parcels conveyed by section; both were described as located in Section 32, Township 5 North, Range 16 East, W.M. What we will refer to as "lot 110" was described in the deed as "The Northeast Quarter of the Northwest Quarter of the Southeast Quarter." Clerk's Paper's (Oct. 23, 2014) (CP) at 73. What we will refer to as "lot 112" was described in the deed as "The East Half of the Southwest Quarter of the Northwest Quarter of the Southeast Quarter." *Id.*

3

(Tamarack Road) was separated from lot 110 by the northern point of the triangular-shaped lot 82, PPI also conveyed a nonexclusive perpetual access easement "beginning along the Northerly boundary of . . . Lot 82 and extending Southerly for 60 feet, providing access . . . from that private road in Ponderosa Park named 'Tamarack.'" *Id.* The Buffingtons did not join in the conveyance of the access easement.

A map appended to the grant of easement roughly depicts the .08 acre piece of lot 82 that was subject to the easement with hash marks:



CP at 69 (partial).

The Lutzes' newly-acquired 10-acre lot 110 is located immediately to the east of lot 82. The grant of easement provided that in consideration for granting of the easements, the Lutzes "shall pay to the Ponderosa Park Owners' Association . . . a yearly assessment . . . which assessment is not to exceed the amount charged as a road

4

assessment to each lot owner in Ponderosa Park subdivision." CP at 68. The Lutzes paid the yearly assessment for the next 13 years until, in 2009, the homeowners' association refused to accept the payment.

Shortly after purchasing the additional two lots and acquiring the easement, the Lutzes used the roads in Ponderosa Park and the easement to construct a gravel access road that became Lutz Parkway. Consistent with the easement, Lutz Parkway crosses the northern tip of lot 82 at a maximum width of 60 feet in order to connect Tamarack Road to lot 110. The Lutzes used the roadway over the years to develop lots 110 and 113, including to install electrical power, other utilities, water wells and septic systems. Manufactured homes were placed on lots 110 and 113 and tenants have used Lutz Parkway for ingress and egress.

In 2006, Ms. Buffington filed a quiet title action to prevent the Lutzes and their tenants from using the corner of her lot for access. After identifying herself, the Lutzes, and their ownership of relevant land, her complaint alleged only the following:

> 3. The defendants claim a right to an easement over plaintiff's property by virtue of an express grant of easement. This grant was not made a [sic] plaintiff or anyone in privity with plaintiff and was made by a person without authority to grant the easement.
> 4. An order should be entered quieting title in plaintiff's property free from any claims of defendants.
> WHEREFORE, plaintiff prays for an order quieting title in the aforementioned real property in her free of all claims made by defendants.

5

CP at 40-41.[2]

In an answer and counterclaim, the Lutzes prayed that Ms. Buffington be denied her request for relief and that the court enter a judgment quieting title to the 1996 easement in them, free and clear of any claim of Ms. Buffington. They alleged that "[o]ne or all" of their parcels was or were "the dominant tenements benefited by" the 1996 easement.[3] CP at 43.

Following a bench trial, the court invalidated the access easement over lot 82, concluding that PPI lacked authority to grant an easement over the lot after having sold it under contract to the Buffingtons. The court concluded that the Lutzes were on notice of

---

[2] The dissent disputes that these allegations stated a claim that was limited to the express easement right then being asserted by the Lutzes. It contends that Ms. Buffington's complaint also placed at issue any right in the Lutzes to a private way of necessity. Dissent at 2-4. In that event, she should have objected to the clearly more narrow judgment entered in the first action and pursued a timely appeal.

[3] The grant of easement stated that it was granted to the Lutzes "to run in perpetuity with the following described land," followed by the legal description for lot 110. The Lutzes' other two parcels adjoin lot 110, but not lot 82. Mr. Lutz testified below that errors were recognized in the legal description in the easement in 2001 and were the subject matter of correspondence and proposed revisions. CP at 140. In neither Ms. Buffington's lawsuit nor this action did the parties have occasion to litigate whether the Lutzes were entitled to reform the easement or whether usage for lots 112 and 113 would be enjoined if the "overburden [was] slight." *See* 17 WASHINGTON PRACTICE, REAL ESTATE § 2.9, at 112 (2d ed. 2004) (observing that "[i]t is supposedly a flat rule that an easement that is appurtenant to a given parcel of land may not be used to serve any other parcel" but recognizing that courts tend not to enjoin such use unless there would be a substantial increase in the burden on the servient tenement). As an appellate court, we do not interject and decide untried issues.

6

the inability of PPI to grant them the easement because the real estate contract between

PPI and the Buffingtons was recorded in March 1996.

The trial court did not quiet title in Ms. Buffington to lot 82 free from all claims,

but only "free from any claim made by any person based upon that Grant of Easement

executed by [PPI] and recorded on September 30, 1996, in Volume 340, Page 206-207,

records of Klickitat County, Washington." CP at 56. Its April 9, 2009 judgment also

stayed the effectiveness of its order quieting title for a period of 90 days from the date of

entry, for reasons that do not appear in our record but, inferentially, anticipated this

action to condemn a private way of necessity.[4] It was toward the end of that 90-day

period that, on June 30, 2009, the Lutzes filed this suit, seeking a private way of necessity

along the same access that was earlier invalidated.

As affirmative defenses to this private condemnation action, Ms. Buffington

contended both that the Lutzes' claim was a compulsory counterclaim in her 2006 quiet

title action and was barred for their failure to assert it, and that the Lutzes had failed to

---

[4] Despite the narrow relief granted by the trial court and its 90-day stay, the dissent contends that "[t]he trial court clearly understood that Ms. Buffington sought to quiet title to lot 82 in her free from any claims of the Lutzes. We know this because the trial court itself determined that the Lutzes' subsequent easement-by-necessity claim was logically related to Ms. Buffington's quiet title action." Dissent at 3. It was former Klickitat Superior Court Judge E. Thompson Reynolds who presided at the quiet title action and stayed the effect of his judgment. The finding of a logical relation (but that the private way of necessity claim was not mature) was made by Judge Pro Tempore Randall Krog, to whom the parties tried the action before us on appeal. CP at 54, 125, 172-73, 186.

join as necessary parties all other Ponderosa Park property owners. She later moved for summary judgment on both grounds. The trial court denied her motion.

At the bench trial, the Lutzes presented expert testimony that just compensation for the taking of an access easement on the northern tip of Ms. Buffington's property was $1,180. Ms. Buffington resisted any award of a way of necessity, but also claimed that she would have demanded close to $83,000 to convey the easement right and that the Lutzes' development of the road had diminished enjoyment of her property. She demonstrated her diminished enjoyment with evidence that the tenants on lot 113 had been investigated for marijuana production, that incidents of firearms discharged on or near the property had been reported, that tenants on both properties were observed exceeding the speed limit as they drove through Ponderosa Park, and that the tenants had been noisy and allowed their dogs to roam freely over Ms. Buffington's property.

Following a bench trial, the trial court entered judgment in favor of the Lutzes, granting them an easement by private way of necessity across lot 82, conditioned upon their paying the judgment amount within 60 days. The Lutzes timely satisfied the judgment. Ms. Buffington appeals.

## ANALYSIS

The Washington State Constitution provides that "[p]rivate property shall not be

8

taken for private use, *except for private ways of necessity*[5], "demonstat[ing] that a remedy for landlocked property was envisioned." *Ruvalcaba v. Kwang Ho Baek*, 175 Wn.2d 1, 6, 282 P.3d 1083 (2012). The legislature has effectuated the constitutional provision through RCW 8.24.010, under which, when "necessary for [a property's] proper use and enjoyment to have and maintain a private way of necessity . . . over or through the land of each other," an owner "may condemn and take lands of such other sufficient in area for the construction and maintenance of such private way of necessity." Compensation must be paid for the property condemned for a private way of necessity and the condemnee may be awarded its reasonable attorney fees and expert witness costs. RCW 8.24.030.

"Under [the] statute, the need for a way of necessity does not have to be absolute." *Ruvalcaba*, 175 Wn.2d at 7 (citing *Brown v. McAnally*, 97 Wn.2d 360, 367, 644 P.2d 1153 (1982)). "'It must, however, be reasonably necessary under the facts of the case, as distinguished from merely convenient or advantageous.'" *Id.* (citations omitted) (quoting *Brown*, 97 Wn.2d at 367). "Additionally, 'the condemnor has the burden of proving the reasonable necessity for a private way of necessity, including the absence of alternatives.'" *Id.* (quoting *Noble v. Safe Harbor Family Pres. Trust*, 167 Wn.2d 11, 17,

---

[5] CONST. art. I, § 16 (emphasis added).

9

216 P.3d 1007 (2009) (citing *State ex rel. Carlson v. Superior Court*, 107 Wash. 228, 234, 181 P. 689 (1919)).

Ms. Buffington contends on appeal that (1) the Lutzes' action to condemn a private way of necessity was a compulsory counterclaim that should have been brought in her quiet title action, (2) the Lutzes failed to join other Ponderosa Park homeowners as necessary parties, (3) the trial court erred by granting a private way of necessity when the Lutzes had an implied easement over neighboring property, (4) it erred by granting the private way of necessity when the Lutzes had waited too long to bring the private condemnation action, and (5) the trial court's award of $1,180 in compensation was insufficient. We address her arguments in turn.

*I. Compulsory counterclaim*

Counterclaims and cross claims are addressed by CR 13, which generally makes it compulsory that a pleading state, as a counterclaim, "any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." CR 13(a). The failure to plead a compulsory counterclaim will ordinarily bar a subsequent action on that claim. *Schoeman v. New York Life Ins. Co.*, 106 Wn.2d 855, 863, 726 P.2d 1 (1986); *Chee Chew v. Lord*, 143 Wn. App. 807, 814,

10

181 P.3d 25 (2008). Ms. Buffington contends that the Lutzes had and could have asserted a claim for a private way of necessity at the time they answered her quiet title complaint but failed to do so and are barred from bringing it in this action.

In *Schoeman*, our Supreme Court adopted the standard for determining whether a claim "arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim" within the meaning of CR 13(a) that controls our decision. The plaintiff, Joyce Schoeman, was the wife of Giovanni Schoeman, an artist, who had entered into an agreement under which Carl Zehner, through Mr. Zehner's solely-owned corporation, E.Z., Inc., would manufacture, sell, and reproduce Mr. Schoeman's works. *Schoeman*, 106 Wn.2d at 856. In 1977, New York Life issued a policy on the life of Mr. Schoeman, which named E.Z., Inc., as beneficiary. *Id.* at 857. The policy lapsed within a year. *Id.* Mr. Schoeman moved to California and, according to Joyce Schoeman, ceased working for E.Z., Inc. *Id.*

Nevertheless, in January 1979, Mr. Zehner and Mr. Schoeman applied to reinstate the policy. *Id.* A demand for the policy amount was made after Mr. Schoeman was shot and killed by Dennis Miller in January 1981. During Mr. Miller's trial for murder, a witness testified that Mr. Miller boasted that someone who stood to benefit from a $100,000 insurance policy on Mr. Schoeman's life hired him to kill Mr. Schoeman. *Id.*

In March 1982, New York Life commenced an interpleader action in which it

11

named all possible claimants to the policy as defendants. The potential claimant/ defendants included Ms. Schoeman, Mr. Zehner, and E.Z., Inc. *Id.* While Ms. Schoeman asserted third party claims against Mr. Zehner and E.Z., Inc. alleging that Mr. Zehner hired Dennis Miller to kill her husband in order to obtain the proceeds of the policy, she did not assert a counterclaim against New York Life. In 1983, New York Life moved for discharge from the interpleader action, having admitted liability on the policy and paid in both the policy amount and interest. No defendant objected and the discharge motion was granted.

After settling with her interpleader codefendants, Ms. Schoeman sued New York Life, alleging it was negligent in issuing the policy when it should have known that E.Z., Inc., no longer had an insurable interest in Mr. Schoeman's life. *Id.* at 858. The *Schoeman* court dismissed her action as barred by res judicata and her failure to raise the claim in the interpleader action. In the course of analyzing whether her claim had been a compulsory counterclaim, the court examined four existing standards for determining when a claim arises out of a "transaction or occurrence" within the meaning of CR 13(a). Relying on two federal decisions, it decided to adopt a broad standard under which counterclaims should be asserted when they are "logically related" to the claim, the limits of which are defined by the rule's exceptions:

12

> [C]ourts should give the phrase 'transaction or occurrence that is the subject matter' of the suit a broad realistic interpretation in the interest of avoiding a multiplicity of suits. Subject to the exceptions, [not instantly relevant] any claim that is logically related to another claim that is being sued on is properly the basis for a compulsory counterclaim; only claims that are unrelated or are related, but within the exceptions, need not be pleaded.
>
> . . . .
>
> "Transaction" is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.
>
> . . . .
>
> The considerations behind compulsory counterclaims include judicial economy, fairness and convenience. Of the four tests, the logical relationship test is the most widely recognized and it best fosters these important considerations. We find the logical relationship test applicable.

*Schoeman*, 106 Wn.2d at 865-66 (first and second alterations in original) (quoting

*Rosenthal v. Fowler*, 12 F.R.D. 388, 391 (S.D.N.Y. 1952); *Moore v. N.Y. Cotton Exch.*,

270 U.S. 593, 610, 46 S. Ct. 367, 70 L. Ed. 750 (1926)).

Applying the test to the facts before it, the *Schoeman* court concluded that "[t]he

issue as to which parties were entitled to the insurance policy funds and whether there

was an insurance policy in effect at all are integrally and logically related," and "Further,

all the necessary facts for a wrongful death claim against the Insurer were known to Mrs.

Schoeman at the time of the interpleader action yet she did not raise this claim." *Id.* at

867.

13

The Lutzes argue that their claim for a private way of necessity was not logically related to Ms. Buffington's quiet title action, which they characterize as "narrow in respect to the issue raised and decided. Only the validity of the [grant of easement] . . . was adjudicated in the First Case." Br. of Resp't at 6. Alternatively, they argue that their action for a private way of necessity falls within the CR 13(e) "exception" to the logical relation standard for claims that either mature or are acquired by the pleader after serving the party's pleading.

RCW 7.28.010 provides the statutory authority for a quiet title action, allowing a person having an interest in real property to obtain a judgment "quieting or removing a cloud from plaintiff's title." The allegations of Ms. Buffington's complaint in the quiet title action were addressed only to the cloud created by the express easement and the court quieted title only with respect to that easement. The dissent, however, points out that the prayer set forth in Ms. Buffington's complaint was broad and from that, it concludes that Ms. Buffington's complaint "was not an academic exercise limited to the narrow issue of the enforceability of the September 1996 easement; rather, she sought to have a judicial determination excluding the Lutzes from using her lot 82 for their access." Dissent at 2-3.

In *Hill v. Hill*, 3 Wn. App. 783, 788, 477 P.2d 931 (1970), *overruled on other grounds by Stokes v. Polly*, 145 Wn.2d 341, 37 P.3d 1211 (2001), in which it was not

14

clear whether the plaintiff in earlier litigation had been seeking a finding of unlawful detainer, ejectment, or possibly other relief, the court observed that "[t]he burden was upon the plaintiff to establish her claim and to make clear just what it is." Where the plaintiff failed to clearly inform the court and counsel of the relief she sought, she was "deemed to have acquiesced in the court's construction and thereby to have elected to treat the action as one for unlawful detainer." *Id.* at 788-89.

We therefore disagree with the dissent that the logical relation between the two actions is clear. We nonetheless believe that the stronger basis on which to affirm the trial court is the Lutzes' argument that until it was determined in Ms. Buffington's quiet title action that their 1996 easement over lot 82 was invalid, they could not establish the "reasonable necessity" required to privately condemn another's property. And it was only because of the quiet title decision that Mr. Lutz then undertook, unsuccessfully, to negotiate with Judith Cyrus for access; explored "all of the public and private roads serving properties in the area to see if an alternative route could be reasonably and sensibly arranged"; and, having concluded that he and his wife should seek a private way of necessity over Ms. Buffington's ground, obtained an expert opinion on just compensation. CP at 141. We therefore turn to the maturity exception created by CR 13(e).

15

Since *Schoeman* rejected the application of the maturity exception to Ms. Schoeman's claim out of hand (noting her awareness of all necessary facts for a wrongful death claim), it provides little guidance on the scope of the maturity exception. Several reported Washington cases have applied the exception to the compulsory counterclaim rule and shed more light on its application.

In *Chew*, Mr. Chew filed a declaratory judgment action in Washington almost two years after he was sued in Nevada by Robert Lord over personal injuries Mr. Lord sustained during an adult scavenger hunt. *Chew*, 143 Wn. App. at 809. Mr. Chew had staged the scavenger hunt, which took place in Nevada. *Id.* Mr. Lord had signed a waiver of liability and assumption of risk form before the scavenger hunt began, and Mr. Chew had relied on the waiver in moving for summary judgment in Nevada that he was contractually relieved of liability. Well into the Nevada litigation, Mr. Chew had also demanded that Mr. Lord indemnify him for his litigation expenses as required by the waiver. At the time of the Washington lawsuit, the parties disputed whether Mr. Lord had denied a duty to indemnify against Mr. Chew's litigation expenses or was only awaiting information about the expenses.

It was two days after the Nevada court denied Mr. Chew's motion for summary judgment that Mr. Chew filed his suit in Washington seeking, among other relief, enforcement of the agreement to indemnify. *Id.* at 811. The Washington trial court

16

dismissed Mr. Chew's action, holding that it was a compulsory counterclaim that was required to be asserted in the Nevada action. *Id.* at 812.

On appeal, Mr. Chew relied on *Parkridge Associates, Ltd. v. Ledcor Industries, Inc.*, 113 Wn. App. 592, 54 P.3d 225 (2002), an earlier and analogous decision of the court, although *Parkridge* did not involve a compulsory counterclaim. In *Parkridge*, the court had held that a claim by Ledcor, a general contractor who was suing its subcontractor, Freeman, for contractual indemnity, did not accrue until Ledcor's liability had become fixed and absolute. Under the subcontractor indemnification agreement at issue in *Parkridge*, Freeman had agreed to defend, indemnify and hold Ledcor harmless from "any and all claims, demands, *losses and liabilities.*" *Id.* at 604.

Ledcor had been presented as early as November 1999 with a claim by Parkridge that Ledcor contended was Freeman's duty to indemnify. But it did not pay the loss to Parkridge until over a year later, in December 2000. *Id.* at 596. At issue for purposes of a statute of repose defense was the parties' dispute over whether Ledcor had a claim for contractual indemnity of the Parkridge loss as early as November 1999 (Ledcor's position) or not until December 2000 (Freeman's position).

The *Parkridge* court held:

> Generally there is a breach of the covenant of indemnity and the indemnitee's right to recover accrues when the liability has become fixed and absolute. An indemnitor's liability to the indemnitee accrues when,

17

under the terms and conditions of the contract, the covenant of indemnity is broken.

*Id.* at 605. The court observed that consistent with these general principles, our Supreme Court had previously held in a case involving "implied in fact" indemnity that "it is 'settled law that indemnity actions accrue when the party seeking indemnity pays or is legally adjudged obligated to pay damages to a third party.'" *Id.* at 601, 605 (quoting *Cent. Wash. Refrigeration, Inc. v. Barbee*, 133 Wn.2d 509, 517, 946 P.2d 760 (1997)). The *Parkridge* court saw "no reason to apply a different rule for accrual of the duty to indemnify under contractual indemnity," and noted that as of the accrual date urged by Ledcor, "mere allegations established *potential*, not actual, liability.. Thus, there was no breach of any duty to indemnify under the subcontract's addendum as of that date." *Id.* at 605.

The *Chew* court applied the "logical relation" test adopted in *Schoeman* in deciding whether Mr. Chew's claim was a compulsory counterclaim in the Nevada action. It concluded that *Parkridge* was not controlling on the issue of accrual, because unlike in that case, Mr. Chew was contending that Mr. Lord had a current duty to defend him—not merely a duty to indemnify him against a future loss. It observed that the *Parkridge* court had "focused on the duty-to-indemnify claim and declined to discuss Ledcor's duty to defend . . . noting that 'the duty to defend and the duty to indemnify do

18

not necessarily accrue together.'" *Chew*, 143 Wn. App. at 815 (quoting *Parkridge*, 113

Wn. App. at 604).[6] "Here," the *Chew* court observed:

> Chew claims that by signing the waiver, Lord agreed to defend and
> indemnify Chew in the Nevada action. Chew also claims that "Lord
> breached the contract by suing Mr. Chee Chew in Nevada." *If Chew's
> claims are true, they were mature at the time Chew served his answer in the
> Nevada action. At that time, he had already incurred legal costs* associated
> with defending the Nevada action.

143 Wn. App. at 815-16 (emphasis added).

A second case is *Lane v. Skamania County*, 164 Wn. App. 490, 501-02, 265 P.3d

156 (2011), which was principally concerned with whether a trial court abused its

discretion in denying a motion to amend an answer under CR 15(d) in order to assert an

after-arising counterclaim. Since the trial court's refusal to allow the amendment was

based on undue delay and unfair surprise, a key dispute was over when the after-arising

counterclaim—a claim for the wrongful filing of a lis pendens—matured.

The relevant dates were as follows:

- In <u>March 2003</u> the Lanes, petitioned under LUPA[7] to enjoin their neighbors, the
  L'Hommedieus, from installing a second septic system on their property in alleged
  violation of a restrictive covenant;

---

[6] The *Parkridge* court also recognized that a contention by Ledcor that Freeman had an earlier-accruing duty to defend would present a different issue, but refused to address it, stating, "Ledcor does not argue on appeal the duty to defend claim." 113 Wn. App. at 604.

[7] The Land Use Petition Act, chapter 36.70C RCW.

- The L'Hommedieus were granted partial summary judgment, an appeal was taken, and the appellate court reversed, finding material facts were in dispute;

- After remand, in June 2006, the Lanes recorded a lis pendens against the L'Hommedieus' property;

- At the conclusion of a February 2007 bench trial, the trial court again found that the restrictive covenant did not apply to the L'Hommedieus' property and awarded attorney fees;

- A second appeal was taken in which the court reversed the fee award but affirmed the conclusion that the covenant did not apply to the L'Hommedieus;

- On January 12, 2010, the appellate court issued the mandate in the second appeal; and

- On January 21, 2010, the L'Hommedieus moved in the trial court under CR 13(e) to supplement their pleadings to assert the wrongful filing of a lis pendens.

*Id.* at 493-95.

The court recognized that CR 13(e) applied by its plain language, since the L'Hommedieus filed their answer before the Lanes filed the lis pendens. *Id.* at 496-97. In connection with the controlling dispute over whether the January 2010 motion to amend was unduly late, the L'Hommedieus maintained that their claim for wrongful filing of the lis pendens did not accrue until after the mandate in the second appeal was issued in 2010. *Id.* at 495. The *Lane* court disagreed, explaining:

> The bases of the L'Hommedieus' counterclaim came into existence in 2006 (or shortly thereafter), when the Lanes [recorded] the lis pendens and were not dependent on the outcome of the main action tried after remand from this court in 2005. As in *Chew*, only the L'Hommedieus'

20

right to recover on their counterclaim, i.e., their status as the prevailing party, awaited the main action's outcome.

*Id.* at 501.

The teaching of *Schoeman, Chew* and *Lane* is that a cause of action is not mature until all of its elements are capable of being asserted and proved by the plaintiff. To prevail on a claim of private way of necessity, the Lutzes had to establish that the private way sought was reasonably necessary. *Ruvalcaba*, 175 Wn.2d at 7. In *Dreger v. Sullivan*, 46 Wn.2d 36, 38-40, 278 P.2d 647 (1955) our Supreme Court held that where it would appear that plaintiffs seeking to condemn a private way of necessity had another legal right of access and it was only "a mere admeasurement of convenience and expense" that prompted their effort to obtain a different access, the plaintiffs had not established necessity for a means of ingress and egress over the defendant's property:

> Unless and until it is established that the route over the Copenhaver property . . . is not available to them, the plaintiffs cannot sustain the burden of proof that the route across the Sullivan property . . . is even "reasonably necessary" for the proper use and enjoyment of their property.

Ms. Buffington argues, however, that a federal treatise relied on by the courts in *Chew* and *Lane* supports an even more narrow application of the CR 13(e) exception and would exclude the Lutzes' claim. She relies on the following language and particularly on the language we highlight:

21

This exception to the compulsory counterclaim requirement necessarily encompasses a claim that depends upon the outcome of some other lawsuit and thus does not come into existence until the action upon which it is based has terminated. . . . However, *a counterclaim will not be denied treatment as a compulsory counterclaim solely because recovery on it depends on the outcome of the main action. This approach seems sound when the counterclaim is based on pre-action events and only the right to relief depends upon the outcome of the main action.*

Br. of Appellant at 12-13 (Emphasis omitted) (Emphasis added) (footnotes omitted) (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1411, at 82-84 (2d ed. 1990). This discussion by the treatise is also cited by *Chew*, 143 Wn. App. at 814 and *Lane*, 164 Wn. App. at 498-99 (citing *Chew*).

When § 1411 is read in its entirety, the highlighted language is abstruse, since the treatise includes examples of counterclaims that are not compulsory *precisely because* recovery on them depends on the outcome of the main action. The discussion by the treatise that Ms. Buffington omits with her ellipses, states:

For example, a claim for malicious prosecution cannot be a compulsory counterclaim in the allegedly wrongfully prosecuted action, and a claim for contribution cannot be compulsory in the action whose judgment is the subject of the contribution suit.

6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1411, at 82-83 (2d ed. 1990) (footnotes omitted).

Representative of the cases cited by the treatise in which malicious prosecution was held not to be a compulsory counterclaim is *Bose Corp. v. Consumers Union of U.S., Inc.*, 384 F. Supp. 600 (D. Mass. 1974). The *Bose* court held that a defendant's counterclaim that the action against it constitutes malicious prosecution "is premature; the defendant must, and cannot, allege a favorable termination of this suit if it is to proceed on a theory of malicious prosecution." *Id.* at 603. A contribution case cited by the treatise, *Slavics v. Wood*, 36 F.R.D. 47 (E.D. Pa. 1964) holds that "[a] claim for contribution can only arise after trial and judgment against the defendants," and, since "Rule 13 has no provision which accelerates an unmatured claim, therefore a claim for contribution which is *contingent* cannot be the subject of a counterclaim."

Since the treatise recognizes that counterclaims are sometimes treated as unmatured where recovery depends upon the outcome of the main action, its use of the word "solely" in the statement on which Ms. Buffington relies is clearly important ("[A] counterclaim will not be denied treatment as a compulsory counterclaim *solely* because recovery on it depends upon the outcome of the main action, [however]."). WRIGHT ET AL., *supra*, § 1411, at 83-84 (1990) (emphasis added). It requires that we examine the cases cited as authority for that proposition in order to determine what makes them different.

The treatise cites two cases as authority. *Interphoto Corp. v. Minolta Corp.*, 47

23

F.R.D. 341 (S.D.N.Y. 1969) was evidently the original source of the proposition. *See*

*Springs v. First Nat. Bank of Cut Bank*, 835 F.2d 1293, 1296 (9th Cir. 1988) (describing

the Wright treatise as "cit[ing] the *Interphoto* rationale with approval").

In *Interphoto*, the plaintiff, a distributor for Minolta Corporation, sued it for

antitrust violations, contending that Minolta had threatened to terminate its

distributorship. Interphoto alleged that the threatened termination was in retaliation for

its refusal to go along with Minolta's and others' antitrust conspiracy. 47 F.R.D. at 342-

43. Interphoto made a successful threshold showing of the illegal conspiracy, obtaining a

preliminary injunction restraining Minolta from cutting off sales to Interphoto. *Id.* at 343.

Minolta thereafter amended its answer to assert, by counterclaim, that it was contractually

entitled to terminate Interphoto's distributorship and obtain the return of its inventory. It

sought to enforce Interphoto's inventory return obligations, which it contended were

being breached. *Id.* Interphoto moved to dismiss the counterclaim based in part on its

argument that "the existence of Minolta's counterclaim depends upon its successfully

defending the main action." *Id.*

CR 13(e) was at issue in *Interphoto* in its affirmative context of providing a basis

for a *permissive counterclaim*, not in the negative "exception" context of defining the

limits of what is compulsory under CR 13(a). Either context entails an identical inquiry

into whether a claim has "matured or was acquired by the [party] after serving [an earlier]

24

pleading." CR 13(e). But in its affirmative context, CR 13(e) provides only that the answering party may assert the counterclaim, not that it is required to.

Minolta wanted to assert the counterclaim and was prepared to prove its contractual right to a return of its inventory. While its recovery would "depend on the outcome of the main action," WRIGHT ET AL., *supra*, § 1411, at 84, it depended on facts that, while not yet proved, Minolta intended to prove. It did not depend on a judicial outcome that Minolta did not seek but that might be foisted upon it.

The other case cited by the treatise as support for the proposition that "[a] counterclaim will not be denied treatment as a compulsory counterclaim solely because recovery on it depends on the outcome of the main action," *id.* at 83-84, is *Springs*, 835 F.2d 1293. The plaintiff in *Springs* had been sued for foreclosure of a trust indenture entered into when he refinanced his home. *Id.* at 1295. He defaulted but later appeared and moved to set aside the default judgment. His motion was denied.

Springs then commenced a tort action against his lender, asserting that the bank had been negligent in allowing an Internal Revenue Service tax lien to take priority over its trust indenture and had acted in bad faith by purchasing his home at the sheriff's sale for less than fair market value. *Id.* The district court found that both of Springs' claims were compulsory counterclaims in the foreclosure action and granted summary judgment.

On appeal, the Ninth Circuit made an important distinction between the negligence

25

and bad faith claims. It observed that the negligent act of the bank "occurred at the time the second trust indenture was executed. Thus, Springs' claim matured prior to the Bank's foreclosure action." *Id.* at 1296. Citing *Interphoto* and the Wright treatise, the court held that "having failed to raise the negligence claim during the foreclosure proceeding, Springs is barred from asserting it in this action." *Id.* It affirmed dismissal of the bad faith claim as well, but on a distinguishable basis. Implicitly recognizing that the bad faith claim did not mature until the foreclosure sale, the Ninth Circuit held that res judicata barred the bad faith claim because Springs had been given the opportunity to raise it during the motion to set aside the default judgment but failed to do so. *Id.*

The only other case cited by the treatise in which a counterclaim was deemed compulsory even though it depended upon the outcome of the main action (although with the signal "but compare") is *Simkins Industries, Inc. v. Fuld & Co., Division of Metropolitan Greetings, Inc.*, 392 F. Supp. 126 (E.D. Pa. 1975). In that case, Fuld was sued for amounts owed on account by Simkins, and Simkins used the occasion to serve writs of attachment on 26 of Fuld's obligors. Fuld responded with a multimillion dollar counterclaim for malicious prosecution based on the allegedly wrongful attachments. *Id.* at 128. Simkins moved to dismiss the counterclaim, in part on the basis that its main action had not been terminated in favor of Fuld. *Id.*

The court agreed that

26

> [i]f Fuld's counterclaim is interpreted as a damage claim for malicious use of process, then it would appear that the claim is premature and pleaded in violation of Fed. R. Civ. P. 13(a). A plaintiff[,] . . . if he is to maintain an action for malicious use of process under Pennsylvania laws, must allege and prove, inter alia, that the main action has terminated favorably to him. Fuld cannot possibly make the required allegation in the counterclaim because the main action in which it is a defendant is still pending.

*Id.* at 129 (footnote omitted) (citations omitted). At the same time, the court observed that the common law tort of abuse of process does not require that the main action first be terminated. *Id.* at 130. Since it found the averments of the complaint somewhat unclear, it granted the motion to dismiss but with leave to amend "if [Fuld] believes the facts warrant its doing so." *Id.*

What distinguishes the cases identified by the Wright treatise as presenting counterclaims that were compulsory even though dependent upon the outcome of the main action is that each involved claims that were both logically related to, and not inconsistent with, the defendants' position in the main action. Minolta would not recover on its counterclaim in *Interphoto* unless it established a valid distributorship agreement that had been breached, but there was no reason why it could not pursue that claim in the main action—and it wanted to. Springs would not recover on his counterclaim for the bank's negligence in closing his refinancing but again, there was no reason why that claim could not be asserted at the time of the foreclosure action. Fuld would not recover for abuse of process without proving its elements, but (unlike its malicious prosecution

27

claim) there was no reason it could not be pursued in response to Simkins' collection action. In all three cases, then, the "sole" fact that recovery on the claim in the main action depended upon proving the claim did not prevent it from being mature.

Here, by contrast, a claim for a private way of necessity in Ms. Buffington's action would be diametrically inconsistent with the Lutzes' position in that action. It would tend to be disproved by their evidence and argument that they had a valid express easement. There was a clear reason why the Lutzes would not pursue such a claim until and unless their express easement right was invalidated. *Cf. Taylor v. Bell*, 185 Wn. App. 270, 284, 340 P.3d 951 (2014), *review denied*, 183 Wn.2d 1012, 352 P.3d 188 (2015) (recognizing that if a party's position is rejected by a court, it is not judicially estopped to rely upon the court's determination in pursuing a different claim thereafter).

Accordingly, this was not a case in which the "sole" reason for refusing to treat the Lutzes' counterclaim as compulsory was because they would have to prevail in the main action to recover. The additional reason was that the claim would have been wholly inconsistent with the legal position they were taking in the main action and they understandably would not assert it. The facts of this case do not fall within the proposition relied on by Ms. Buffington.

28

## II. *Necessity of adding neighboring property owners*

Ms. Buffington next argues that the trial court should have dismissed the Lutzes' action for failure to join, as parties, the other homeowners in Ponderosa Park. She contends they were necessary parties because the Lutzes must travel over private roads within the development that exist by virtue of easements across the homeowners' properties. Unless the Lutzes' can prove access _to_ her property, she argues, they cannot establish a private way of necessity _over_ it.

"CR 19 requires joinder of a party with an interest relating to the subject of the action where disposition in the party's absence may impair the party's ability to protect its interest in the litigation." *Eugster v. City of Spokane*, 139 Wn. App. 21, 30, 156 P.3d 912 (2007). A necessary party is

> [a] person who is subject to a service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action . . . if (1) in [his] absence complete relief cannot be accorded among those already parties, or (2) [he] claims an interest relating to the subject of the action as is so situated that the disposition of the action in [his] absence may (A) as a practical matter, impair or impede [his] ability to protect that interest or (B) leave any of the persons already [a party] subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of [his] claimed interest.

CR 19(a). CR 19(a) ensures that parties will be joined if needed for a just adjudication. *Crosby v. County of Spokane*, 137 Wn.2d 296, 306-07, 971 P.2d 32 (1999).

Ms. Buffington cites *Brown*, in which passing mention is made of the fact that the

29

Browns—the parties seeking a private way of necessity over a private road—had joined "other necessary parties . . . including corporations having utilities along the western one-fourth mile" of the road. 97 Wn.2d at 365. The Browns sought an unusual private way of necessity: a 50-foot easement to serve their proposed residential development that they had agreed to transfer to the county to serve as a public road. In expectation of receiving the road the county required, and the court awarded to the Browns, the right "to locate public and private utilities," "to regulate approaches," and to "regulate uses inconsistent with the use of the right of way . . . if it were to become a county road." *Id.* at 369. The need to join corporations having utilities along the private road was not a contested issue on appeal.

The Washington Supreme Court reversed the trial court's award of the private way of necessity, refusing to countenance an end run around different and more onerous proof required for public condemnation of private property, holding that "the owner of landlocked property is only authorized to condemn land for his . . . own needs and use, and is not authorized to condemn land for another or for some other use." *Id.* at 372.

Unlike the Browns, the Lutzes were not seeking a private way of necessity over property in which owners other than Ms. Buffington had an interest. They already had an easement to cross the private roads in Ponderosa Park, obtained in September 1996 from PPI. Relying on the easement, they built a road in October 1996 that they had used for

30

almost 13 years before commencing this action in June 2009. While Ms. Buffington questions the validity of the easement, other property owners have not sought to invalidate it.

Ms. Buffington was unquestionably entitled to present evidence and argue that the Lutzes' asserted easement rights over the private roads in Ponderosa Park were invalid, thereby detracting from their reasonable necessity for a private right of way over the northern tip of her land. But the court could, and evidently did, find her evidence and argument of invalidity unpersuasive. She has not challenged the sufficiency of the evidence to support the court's explicit finding of fact 19 that "[f]rom 1996 until the present . . . no individual owners of properties in Ponderosa Park, except Plaintiff Buffington, have taken any actions, legal or otherwise, in an attempt to prevent Lutz and Lutz tenants from using the roads in Ponderosa Park." CP at 180-81. She has not challenged the sufficiency of the evidence to support the trial court's implicit finding that the Lutzes appear to enjoy the right to use the private roads.

The Lutzes sought only a route across Ms. Buffington's property in which other property owners have no interest. The other property owners are not bound by the trial court's decision in the action below, to which they were not parties. The trial court correctly concluded that the other property owners were not needed for a just adjudication and did not need to be joined as parties.

31

*III. Whether availability to the Lutzes of an implied easement
barred their action*

Ms. Buffington next contends that the Lutzes should not have been awarded a private way of necessity because they already enjoyed an implied easement over land to the east of the Lutzes, owned by Judith Cyrus. The trial court found that the Lutzes had acquired lots 110 and 112 from the Brokaws, that the Brokaws had sold to Judith Cyrus, and that Ms. Cyrus had developed private roads within her property. Ms. Buffington argues that these findings show that the Lutzes enjoyed an implied easement. Br. of Appellant at 21-22.

Whether other access to landlocked property exists weighs heavily against the showing of reasonable necessity. *Roberts v. Smith*, 41 Wn. App. 861, 862, 707 P.2d 143 (1985). Thus, the existence of an implied easement over the property of the petitioner's grantor can be fatal to an action for a private way of necessity. *Id.* Once a defendant produces some evidence that an implied easement exists, the plaintiff's burden of showing reasonable necessity includes the burden of establishing the absence of an implied easement access. *Id.* "If such an easement were implied, plaintiffs would carry the burden of proof by showing that the implied easement over [the] grantor's land was unreasonable or prohibitively expensive." *Id.* at 865.

32

The factors relevant to establishing an implied easement, either by grant or reservation, are (1) when there has been unity of title and subsequent separation, (2) when there has been an apparent and continuous quasi easement existing for the benefit of one part of the estate to the detriment of the other during the unity of title, and (3) when there is a certain degree of necessity that the quasi easement exist after severance. *Adams v. Cullen*, 44 Wn.2d 502, 505, 268 P.2d 451 (1954).

The first factor is essential for creation of an implied easement. *Id.* The presence or absence of the second and third characteristics are aids in determining what is the "cardinal consideration—the presumed intention of the parties as disclosed by the extent and character of the user, the nature of the property, and the relation of the separated parts to each other." *Id.* at 505-06 (citing 3 TIFFANY, REAL PROPERTY (3d ed.) 253, 254, § 780).

The trial court's conclusion of law 5 states, "There is no implied easement over the Brokaw property." CP at 183. After reciting the three factors relevant in implying an easement, the conclusion states:

> While there was a former unity of title and subsequent separation, the parties, Lutz and Brokaw, involved in the land transfer in 1996 of lots 110 and 112 did not discuss nor contemplate an easement over the retained Brokaw property. There was no quasi or continuous use of the Brokaw property for the benefit of plaintiff Lutz property, i.e., lot 110 and lot 112, after severance of title.

33

CP at 183 (Conclusion of Law 5).

The following findings of fact provide support for the court's conclusion

that no easement is implied from the Brokaw conveyance:

> In 1996 Plaintiff Lutz purchased lot 110 and 112 from Ernest Brokaw.
> E. Brokaw at the time of the sale owned adjacent property to the south and
> east of lot 110 and lot 112 in the southeast quarter of section 32 and south
> west quarter of section 33 that fronts Pipeline road. No roadway existed
> over Brokaw property to access lot 110 and 112.

CP at 178 (Finding of Fact 3).

> At time of closing, Plaintiff Lutz believed he had access to Lot 110, 112
> and 113 from the public Pipeline Road to his parcels by an easement over
> East Ponderosa Road, Tamarack Road and over Lot 82 based upon
> discussion Plaintiff Lutz had with W. Kershaw, a principal of Ponderosa
> Parcels, Inc, a developer of Ponderosa Park, and an owner/member of
> Ponderosa Park Owners Association.

CP at 178 (Finding of Fact 4).[8]

> At the time of purchasing lot 110 and lot 112, Plaintiff Lutz did not discuss
> with Brokaw an easement over the remaining Brokaw property for ingress
> and egress.

---

[8] This finding is not inconsistent with the finding in the 2006 action that the Lutzes were on notice of the inability of PPI to grant them an easement because of the recording of the real estate purchase contract and the covenants, conditions, and restrictions for Ponderosa Park. The Lutzes had constructive notice by virtue of the recorded documents. *See Strong v. Clark*, 56 Wn.2d 230, 232, 352 P.2d 183 (1960) ("When an instrument involving real property is properly recorded, it becomes notice to all the world of its contents."). The finding that they were subjectively unaware of the inability of PPI to grant an easement is not assigned error by Ms. Buffington and is supported by substantial evidence.

CP at 178 (Finding of Fact 5).

> Plaintiff Lutz believed he had a valid easement to access to his property by using the public Pipeline Road to East Ponderosa Road to Tamarack Road and over lot 82.

CP at 178 (Finding of Fact 5).

> Plaintiff Lutz did not ever use the Brokaw property to access lots 110 and 112, instead only accessing those properties from 1996 forward by traversing from the public Pipeline Road to E. Ponderosa Road to Tamarack Road to Lutz Parkway which is the [sic] located over the north tip of lot 82 and the property requested to be condemned.

CP at 179 (Finding of Fact 11).

> From 1996 to 2009, Plaintiff Lutz had paid dues commensurate with members of Ponderosa Park Owners Association.

CP at 180 (Finding of Fact 19).

"Where the trial court has weighed the evidence our review is limited to determining whether the findings are supported by substantial evidence and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." *Holland v. Boeing Co.*, 90 Wn.2d 384, 390, 583 P.2d 621 (1978). We do not reweigh evidence or reassess witness credibility. *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013). Questions of law and conclusions of law are reviewed de novo. *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003).

Under RAP 10.3(g),

[a] separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number. The appellate court will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto.

Ms. Buffington has not assigned error to any of the findings of fact that we have identified as supporting the trial court's legal conclusion. They are therefore verities on appeal. *State v. Williams*, 96 Wn.2d 215, 220, 634 P.2d 868 (1981) (citing *Riley v. Rhay*, 76 Wn.2d 32, 33, 454 P.2d 820 (1969)).

Instead, Ms. Buffington presents an ostensible syllogism: because the trial court concluded that she established the essential unity and separation element[9] and that the Lutzes' property is landlocked,[10] and because Washington decisions hold that intent to create an implied easement is implied when a grantor sells landlocked property,[11] it follows necessarily that the intent is implied in the case of the Brokaws' conveyance to the Lutzes.

She proceeds from a flawed premise that intent to create an easement is implied

---

[9] *See* CP at 183 (Conclusion of Law 5) (stating in part, "[T]here was a former unity of title and subsequent separation").

[10] As evidenced by their action seeking a right of way by necessity and the court's conclusion of law 4 (stating in part, "The invalidated easement in 2009 . . . over the north tip of lot 82 resulted in lot[s] 110, 112 and 113 being landlocked with no valid means of ingress or egress"). CP at 183.

[11] Citing *Carlson*, 107 Wash. at 232.

36

whenever a grantor conveys property that proves to be landlocked, whether or not the parties believed that to be true at the time. She relies on the statement in *Carlson* that

> [w]hen D.J. Davis sold a part of his land to the petitioner, an easement or way of necessity was implied in the grant. This was the rule of the common law. It has been followed almost, if not quite, universally in other states, and has never been questioned in this state.

*Carlson*, 107 Wash. at 232. *Carlson* discloses, however, that the petitioner, C.H. Davis, "[s]ome seven years ago . . . bought a tract of ten acres from his father, D.J. Davis. The tract was landlocked. . . . Petitioner has improved his land, *and for the seven years of his ownership has maintained a way over the lands of his father.*" *Id.* at 229 (emphasis added). It is apparent in *Carlson* that the petitioner and his father contemplated use of access of the father's land from the time of the conveyance.

Other Washington decisions make clear what *Carlson* had no occasion to address: that since the presumed intention of the parties is the prime factor in determining whether an easement by implication has been created, an easement will not be implied if evidence indicates that the grantor never intended to impose a servitude on his retained property in favor of the property conveyed.

In *Rogers v. Cation*, 9 Wn.2d 369, 115 P.2d 702 (1941), the petitioners sought to establish an implied easement to use water from a spring located on an adjoining upstream property. Prior unity of title and separation was clear; both properties had been

under common ownership until divided in settling an estate, with a son taking one parcel and a daughter taking the other. *Id.* at 372. The petitioners were the successors to ownership of the downstream parcel and had relied for years on water drawn from the upstream parcel but were unable to establish adverse possession. Their alternative claim of an implied easement was rejected on appeal because the evidence showed that upon separation of title, water had been available on and was drawn from the downstream parcel itself. Accordingly, the petitioners "did not meet the burden of showing that there was such an adaptation and use of the land before it was divided as to indicate that [the original grantor] or his heirs intended to impose a permanent servitude upon one part of it in favor of the other." *Id.* at 379; *accord, Granite Beach Holdings, LLC v. Dep't of Natural Res.*, 103 Wn. App. 186, 196, 11 P.3d 847 (2000) ("Necessity must exist at the date the common parcel is severed.").

Here, the trial court found credible Mr. Lutz's testimony that the parties believed the Lutzes were acquiring complete easement access in September 1996, when PPI conveyed lots 110 and 112. The testimony finds support in the 1996 documents purporting to grant easement rights; the fact that the Brokaws did not expressly grant easement rights to the Lutzes; the fact that in later conveying to Ms. Cyrus, the Brokaws did not identify easement rights in the Lutzes as an exception from title; and the Lutzes'

38

continuous and exclusive reliance for access on Lutz Parkway rather than on any route over the adjoining Brokaw/Cyrus land.

Ms. Buffington also argues that the court erred in relying for its conclusion that no easement was implied on the fact that no road providing access to lots 110 and 112 existed over the Brokaw property at the time those lots were sold to the Lutzes. She points to Washington decisions holding that easements can be implied despite no preexisting quasi easement. Br. of Appellant at 22-24. But those decisions only affirm that whether there was a quasi easement existing for the benefit of one part of the estate to the detriment of the other during the unity of title is *relevant* to presumed intent, but is not *necessary*. The trial court treated the nonexistence of a quasi easement as relevant, not necessary.

Ms. Buffington demonstrates no error in the trial court's conclusion that no implied easement was shown.

### IV. *Whether the Lutzes' claim for a private way of necessity is unreasonably tardy*

Ms. Buffington next contends that the Lutzes delayed too long in making their claim, relying on our Supreme Court's decision in *Ruvalcaba*, 175 Wn.2d 1, in which the court held that the Ruvalcabas' claim for a private way of necessity was an abuse of the

private necessity doctrine given the Ruvalcabas' responsibility for their landlocked situation and their decades' long delay in seeking to acquire access over others' land.

The Ruvalcabas voluntarily landlocked their own parcel in 1971 by selling property that provided its access to a public throroughfare without reserving an easement. *Id.* at 4. Thirty-five years later, after the Ruvalcabas found out that their parcel was suitable for a home site, they sought a private way of necessity.

The Washington Supreme Court refused to adopt a bright-line rule that no one who voluntarily landlocks his or her own property can gain the benefit of private condemnation under RCW 8.24.010. *Id.* at 7. But approaching the case with the "overriding public policy goal against making landlocked property useless" in mind, the court held that "no reasonable finder of fact could find that there was reasonable necessity" on the facts before the court. *Id.* at 8.

> The Ruvalcabas are essentially turning our stated public policy goal on its head. They are making a sophisticated, yet convoluted legal argument regarding financial impracticability to manufacture a cloud on title . . . This strategy was also employed approximately 35 years after the Ruvalcabas voluntarily landlocked their own parcel. Such a flagrant abuse of the reasonable necessity doctrine will not be tolerated because it erodes the protections for private property found in article I, section 16 of the Washington Constitution.

*Id.*

40

Ms. Buffington points to the fact that the Lutzes purchased lots 110 and 112 in 1996 and waited until 2009 to commence the action. But this case is nothing like *Ruvalcaba.* The relevant voluntary affirmative act of the Lutzes was to negotiate for and acquire what they believed was legal access at the time they acquired lots 110 and 112. And Ms. Buffington herself suffered the Lutzes to build the roadway in 1996 and use it until the eve of the running of the limitations period for adverse possession in 2006. Nothing about the Lutzes' actions abused the reasonable necessity doctrine.

## *V. Insufficient compensation*

Finally, Ms. Buffington contends that the trial court's award of compensation for the taking of her property was insufficient. The trial court awarded Ms. Buffington a total of $12,430 as compensation and damages. She does not appeal the $11,250 awarded as severance damages but only the $1,180 awarded for the taking. She contends that the testimony of the Lutzes' expert, Eric Walker, did not amount to substantial evidence, and that no reasonable person would have adopted Mr. Walker's approach. Br. of Appellant at 32-35.

No property may be taken under eminent domain without just compensation. CONST. art. I, § 16; RCW 8.24.030. "'Just compensation is the fair market value of the property, taking into consideration as part of the property such improvements as have become permanently affixed thereto, measured as of the date of trial.'" *Shields v.*

41

*Garrison*, 91 Wn. App. 381, 385, 957 P.2d 805 (1998) (quoting *State v. Wilson*, 6 Wn. App. 443, 447, 493 P.2d 1252 (1972)). "'Fair market value is the amount of money which a well informed purchaser, willing but not obliged to buy the property would pay, and which a well informed seller, willing but not obliged to sell it would accept, taking into consideration all uses to which the property is adapted and might in reason be applied.'" *Id.* (quoting *Wilson*, 6 Wn. App. at 447).

Just compensation "must be calculated from the standpoint of what the property owner loses by having his property taken, not by the benefit which the property may be to the condemnor." *Lange v. State*, 86 Wn.2d 585, 589, 547 P.2d 282 (1976). "It is well established that the condemnee is entitled to be put in the same position monetarily as he would have occupied had his property not been taken." *Id.* "'While the owner is forced to sell, he is not to receive by reason of that fact a lesser amount than the property would fairly bring upon the market.'" *Id.* (quoting *Chelan Elec. Co. v. Perry*, 148 Wash. 353, 358, 268 P. 1040 (1928)).

"The trier of fact has discretion to award damages in an amount falling within the range of relevant evidence." *Shields*, 91 Wn. App. at 386 (citing *Mason v. Mortg. Am., Inc.*, 114 Wn.2d 842, 850, 792 P.2d 142 (1990)). A trial court's award of compensation will not be disturbed on appeal if the amount is within the range of substantial evidence in the record. *Id.*

Mr. Walker testified that in arriving at an opinion on just compensation, he determined the value of Ms. Buffington's parcel before and after the imposition of a private way of necessity. In determining the "before" value, he relied on the sales comparison approach, identifying comparable properties that he adjusted for their differences from Ms. Buffington's property. Report of Proceedings (Walker) (RP (Walker)) at 16. He arrived at a "before" value for her property of $75,000.

Mr. Walker testified to two possible approaches to determining the "after" value of Ms. Buffington's property. One, the more qualitative of the two, looks to how the market would view the property with the implied easement. Applying this approach, he testified, "[Y]ou really have the same thing. You could still put in a home site in there. You still have close to [5]—4.9, something very, very close to five acres that's unencumbered by this easement." *Id.* at 18. Under the second approach, which he called the "taking and damages" approach, "what you try to do is to develop a unit value per square foot for what the before situation was." *Id.* at 19.

Mr. Walker explained that under this second approach, he decided to value the "taking" as if the Lutzes were acquiring 100 percent of the land area encumbered by the easement. To reach a value for that .08 acre parcel, Mr. Walker began with the $75,000 "before" fair market value of the entire parcel, determined an aliquot value per square foot of $0.35, and calculated the value of the taking by multiplying the price per square

43

foot by the number of square feet taken (3,370). The product, and thereby his opinion as to the compensation value, was $1,180.

For her part, Ms. Buffington contended that if she were negotiating for the sale of the portion of her property on which the Lutzes sought an implied easement, she would ask for "a sum just less than $83,000." CP at 181. She did not call an expert to testify.

In making its award, the trial court explained in its conclusions of law that it engaged in a "mixed approach." *Id.* at 185. To Mr. Walker's method for calculating a "100 [percent] taking" of the easement area, it added a calculation of severance damages to compensate Ms. Buffington for her diminished enjoyment of the servient parcel. *Id.* Measuring the severance damages as 15 percent of Mr. Walker's "before" value of $75,000, the trial court found the "appropriate amount of the taking as $1180 and damages as $11250." *Id.* at 186.

Since the amount awarded is within the range of the evidence presented to the trial court, we ordinarily would not disturb it. Ms. Buffington nonetheless argues that no substantial evidence supported Mr. Walker's opinion, pointing to the fact that while Mr. Walker relied on the comparable sales approach, he conceded on cross-examination that he had not identified any sales of comparable easements. RP (Walker) at 40. But while conceding that he had not identified easement sales for comparison, Mr. Walker added,

44

"[W]e're not valuing the easement. We're valuing the value impact on Lot 82, not the value of the easement." *Id.* at 40-41.

Ms. Buffington offers only conclusory argument for her contention that short of a market from which comparable easement sales could be identified, Mr. Walker's testimony does not amount to substantial evidence. She cites to no legal authority. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

As Mr. Walker explained, he relied on a comparable sales approach as the basis for a reliable "before" value of the property, not as a basis for placing a value on a purchase or sale of an easement. His "before" and "after" methodology was a rational basis for calculating "what the property owner loses by having his property taken," within the meaning of *Lange*.[12] *Lange*, 86 Wn.2d at 589. Since Ms. Buffington provides no authority otherwise, we do not consider this argument further. *See* RAP 10.3(a)(6)

---

[12] For the first time in her reply brief, Ms. Buffington contends that the court erred by not including the cost of the road in the compensation award, citing *Shields*, 91 Wn. App. at 387. Reply Br. at 19. In *Shields*, it was the party whose property was being privately condemned that had built the road, and it was being partially reimbursed for its own investment. Here, Ms. Buffington is asking to be compensated for the cost of the improvement by the very party that made and paid for the improvement. In any event, we will not consider an argument raised for the first time in a reply brief. *In re Marriage of Sacco*, 114 Wn.2d 1, 5, 784 P.2d 1266 (1990).

45

(providing that a brief should contain not only argument but also citations to legal authority).

### *Attorney fees*

Ms. Buffington asks that she be awarded attorney fees on appeal.

In a condemnation action, a trial court has discretion to grant an award for attorney fees in light of the circumstances in each case. *Beckman v. Wilcox*, 96 Wn. App. 355, 367, 979 P.2d 890 (1999). RCW 8.24.030 gives the trial court discretion "without regard to whether the condemnee has prevailed in the action or on any particular issue," *Sorenson v. Czinger*, 70 Wn. App. 270, 279, 852 P.2d 1134 (1993), reflecting a recognition that condemnees are, through no fault of their own, involuntarily drawn into such actions.

The Lutzes argue that we should deny or reduce Ms. Buffington's request for fees, contending that her defense strategy "has been, from the outset, to increase the cost of this litigation," and pointing to our authority to "'consider a condemnee's actions'" including "'actions during the course of the case to increase the cost of litigation.'" Br. of Resp't at 41-42 (emphasis omitted) (quoting *Noble*, 167 Wn.2d at 23).

We exercise our discretion to award attorney fees to Ms. Buffington, but reduced for arguments that unnecessarily increased the cost of appeal. Her argument based on delay is frivolous, and other of her arguments necessarily fail when the proper standard of

46

No. 32878-3-III
*Lutz v. Buffington*

review is applied. A reduction of her otherwise reasonable fees and costs by 30 percent is appropriate.

We affirm the judgment quieting title to the Lutzes and award Ms. Buffington fees and costs on appeal to the extent indicated, subject to compliance with RAP 18.1.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

I CONCUR:

_____
Brown, J.P.T.

47

32878-3-III

LAWRENCE-BERREY, J. (dissenting) — I disagree with the majority's
determination that Tom and Karen Lutzes' easement-by-necessity claim was not a
compulsory counterclaim. I also disagree with the majority's determination that the
Lutzes' easement-by-necessity claim was not mature for purposes of CR 13(e).
Disagreement alone does not prompt my dissent. I dissent because the new rule
announced by the majority concerning CR 13(e) is inconsistent with *Lane v. Skamania
County*, 164 Wn. App. 490, 265 P.3d 156 (2011) and *Chew v. Lord*, 143 Wn. App. 807,
181 P.3d 25 (2008), and is inconsistent with the policy behind compulsory counterclaims
as announced by *Schoeman v. New York Life Insurance Co.*, 106 Wn.2d 855, 726 P.2d 1
(1986).

1. *Standard of Review: De Novo*

Compulsory counterclaims are governed by CR 13. "We review the interpretation
of court rules, a matter of law, de novo." *Lane*, 164 Wn. App. at 496 (citing *Burt v. Dep't
of Corr.*, 168 Wn.2d 828, 832, 231 P.3d 191 (2010)).

2. *The Lutzes' present action was a compulsory counterclaim*

Generally, a failure to plead a compulsory counterclaim will bar a subsequent
action on that claim. *Schoeman*, 106 Wn.2d at 863; *Chew*, 143 Wn. App. at 814. A

claim is compulsory if "it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." CR 13(a).

*Schoeman* is the leading case in this state discussing compulsory counterclaims. *Schoeman* adopts the broadest of four competing tests for determining whether a counterclaim is compulsory. The broad test adopted by *Schoeman* simply asks "whether the claim and counterclaim are logically related." 106 Wn.2d at 865. The reason *Schoeman* adopted the broadest of the possible four tests is because it best fosters the considerations behind compulsory counterclaims, which include "judicial economy, fairness and convenience." *Id.* at 866.

The majority states: "The allegations of [Lisa] Buffington's complaint in the quiet title action were addressed only to the cloud created by the express easement." Majority at 14. I disagree. Ms. Buffington's simple two-page complaint is entitled "Complaint To Quiet Title." Clerk's Papers (CP) at 40. It asks for an order "quieting title in [lot 82 in her] *free from any claims of* [*the Lutzes*]"; and then repeats, "plaintiff prays for an order quieting title in [lot 82] in her *free of all claims made by* [*the Lutzes*]." CP at 41 (emphasis added).

"An action to quiet title allows a person in peaceable possession . . . of real property to compel others who assert a hostile right or claim to come forward and assert their right or claim and submit it to judicial determination." *Kobza v. Tripp*, 105 Wn. App. 90, 95, 18 P.3d 621 (2001). Understood in its proper context, Ms. Buffington's

2

action to quiet title was not an academic exercise limited to the narrow issue of the enforceability of the September 1996 easement; rather, she sought to have a judicial determination excluding the Lutzes from using her lot 82 for their access.

The majority quotes *Hill v. Hill*, 3 Wn. App. 783, 788, 477 P.2d 931 (1970) for the proposition that "[w]here the plaintiff fail[s] to clearly inform the court and counsel of the relief she [seeks], she [is] 'deemed to have acquiesced in the court's construction and thereby to have elected to treat the action as one for [a more narrow remedy].'" Majority at 14. This case is clearly distinguishable from *Hill*. Here, Ms. Buffington could not have been clearer as to the relief she sought. The title of her complaint, the cause of action listed, and the remedy she sought clearly requested the trial court to quiet title to lot 82 in her "free from *any claims* of [the Lutzes]." CP at 41 (emphasis added). The mere fact that the trial court did not quiet title, but instead narrowly invalidated the easement, was because the Lutzes did not allege any right to use the easement other than the express easement. The narrowness of the relief granted by the trial court does not mean that the trial court misunderstood the relief sought by Ms. Buffington in her quiet title action. The trial court clearly understood that Ms. Buffington sought to quiet title to lot 82 in her free from any claim of the Lutzes. We know this because the trial court itself determined that the Lutzes' subsequent easement-by-necessity claim was logically related to Ms. Buffington's quiet title action, and therefore was a compulsory counterclaim. I would affirm the trial court's determination in this regard, and hold that the Lutzes' easement-by-necessity claim was a compulsory counterclaim.

3

3.     *CR 13(e)'s exception to the requirement for asserting compulsory counterclaims does not apply here*

The Lutzes argue that CR 13(e) provides an exception to the compulsory counterclaim rule under the facts of this case. CR 13(e) provides: "A claim which either matured or was acquired by the pleader after serving the pleading may, with the permission of the court, be presented as a counterclaim by supplemental pleading."

By its plain terms, CR 13(e) allows parties, with court permission, to add claims which matured or were acquired during the litigation to be litigated in conjunction with the existing claims. Ostensibly, if a claim was not acquired or did not mature until *after* the existing claims were litigated, then it may be litigated separately. Only a couple of cases in Washington have discussed whether a claim matured after the existing claims were litigated. Both cases concluded that the claims matured prior to the existing claims being litigated, and therefore were barred from further assertion.

The first of these two cases is *Chew*. There, Robert Lord brought suit in Nevada against the owner of a mine and others for personal injuries he sustained in the mine during a scavenger hunt. *Chew*, 143 Wn. App. at 809. One of the defendants was Chee Chew, who staged the game. *Id.* After two years of litigation, Mr. Chew demanded that Mr. Lord indemnify him for his litigation expenses, as required by an agreement signed by Mr. Lord prior to participating in the scavenger hunt. *Id.* at 810. Mr. Chew filed a summary judgment motion in the Nevada action, seeking enforcement of this agreement. *Id.* at 811. The Nevada court denied Mr. Chew's motion. *Id.* Two days later, Mr. Chew

4

filed suit in Washington seeking, among other relief, enforcement of the agreement to indemnify. *Id.* The Washington trial court dismissed Mr. Chew's action, holding that it was a compulsory counterclaim that was required to be brought in the Nevada action. *Id.* at 812.

On appeal, the *Chew* court determined that the counterclaim was compulsory and analyzed whether the facts fit into the CR 13(e) exception. *Id.* at 815. In discussing CR 13(e), the *Chew* court quoted a federal treatise discussing Federal Rule of Civil Procedure 13(e):

> This [exception] is derived from the language in the rule limiting its application to claims the pleader has "*at the time of serving the pleading.*" A counterclaim acquired by defendant *after* he has answered will not be considered compulsory, even if it arises out of the same transaction as does plaintiff's claim. . . .
> This exception to the compulsory counterclaim requirement necessarily encompasses a claim that depends upon the outcome of some *other* lawsuit and thus does not come into existence until the action upon which it is based has terminated. . . . However, *a counterclaim will not be denied treatment as a compulsory counterclaim solely because recovery on it depends on the outcome of the main action. This approach seems sound when the counterclaim is based on pre-action events and only the right to relief depends upon the outcome of the main action.*

*Id.* at 814-15 (alterations in original) (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1411, at 81-84 (2d ed. 1990) (the treatise). The *Chew* court held that the CR 13(e) exception did not apply because Mr. Chew had a right to enforce the indemnification agreement at the time Mr. Chew served his answer in the Nevada proceeding. *Id.* at 816.

5

The second case is *Lane*. In March 2003, the Lanes petitioned for review under the Land Use Petition Act, chapter 36.70C RCW, to enforce a restrictive covenant and to permanently enjoin the L'Hommedieus from installing a second septic system on their property. *Lane*, 164 Wn. App. at 493. The trial court granted a temporary restraining order, and then a preliminary injunction enjoining further work on the septic system. Later, the trial court granted partial summary judgment in favor of the L'Hommedieus and quashed the preliminary injunction, holding that a restrictive covenant was not enforceable against them. *Id*. The Court of Appeals reversed and remanded because material issues of fact existed. *Id*. at 494. After remand, in 2006, the Lanes recorded a lis pendens against the L'Hommedieus' property. *Id*. At trial, the L'Hommedieus argued that they were entitled to damages and attorney fees for the wrongfully issued injunction, but did not ask for damages for the wrongfully recorded lis pendens. *Id*. The matter went to trial in 2007, and the decision was appealed. *Id*. In 2009, the second appeal affirmed the trial court's conclusion that the covenant did not apply to the defendant, but reversed the trial court's award of attorney fees. *Id*. at 494-95.

About two weeks after the 2010 appellate mandate, the L'Hommedieus moved to supplement their pleadings under CR 13(e) to assert a counterclaim for damages from the wrongfully recorded lis pendens. *Id*. The L'Hommedieus maintained that their claim for damages did not arise until after the 2010 mandate when they finally prevailed. *Id*. at 495. The *Lane* court disagreed. The court explained:

The bases of the L'Hommedieus' counterclaim came into existence in 2006 (or shortly thereafter), when the Lanes [recorded] the lis pendens and were not dependent on the outcome of the main action tried after remand from this court in 2005. As in *Chew*, only the L'Hommedieus' right to recover on the counterclaim, i.e., their status as the prevailing party, awaited the main action's outcome.[1] Thus, the L'Hommedieus' counterclaim matured in 2006 when the Lanes [recorded] the lis pendens or shortly thereafter, well before the trial in 2007 and well before they moved to assert it after the 2007 trial, the entry of judgment, and this court's mandate in 2010. The claim that their counterclaim did not mature until after our mandate issued in 2010 fails.

*Id.* at 501.

We learn from *Chew* and *Lane* that a determination of whether the CR 13(e) exception applies depends on whether the facts necessary to assert the counterclaim were in existence at the time when a counterclaim could have been filed. We further learn that the counterclaim will not be denied treatment as a compulsory counterclaim merely because *the right to relief depends upon the outcome of the main action.* This is the rule in the treatise quoted by *Chew*. *See Chew*, 143 Wn. App. at 814-15 (quoting 6 WRIGHT, *supra*, § 1411, at 81-84). This rule was applied both by *Lane* and *Chew* in determining that the counterclaims were not within CR 13(e)'s exception.

The majority notes that some cases cited in the treatise follow the rule, whereas others do not. The majority then picks three early cases and attempts to harmonize them. In doing so, the majority announces a new rule not announced in the treatise nor anywhere in this country. The majority's new rule allows a party to file a claim if the

---

[1] *Lane*'s description of claim maturity is inconsistent. As acknowledged by *Lane*, the right to relief depended on the outcome of the main action.

7

new claim is inconsistent with a claim or defense the party asserted in a previous action. Rather than attempting to harmonize three early cases, I would return to the policy behind compulsory counterclaims as set forth by our Supreme Court in *Schoeman*, 106 Wn.2d 855. The policy behind compulsory counterclaims includes "judicial economy, fairness and convenience." *Id.* at 866. This policy is best effectuated by adopting a narrow exception to CR 13(e), such as the exception noted in the treatise, and applied by *Lane* and *Chew*.

CR 8(e)(2) permits a party to assert claims in the alternative, even if the claims are mutually inconsistent. By doing so, the rule encourages all claims that could be litigated in one action to be conclusively litigated. The majority, by allowing a party to hold back an inconsistent claim for later litigation encourages claim splitting. Claim splitting is inconsistent with the purpose of compulsory counterclaims. *See Schoeman*, 106 Wn.2d at 864 ("A liberal and broad construction of Rule 13(a) is appropriate to avoid a multiplicity of suits."). I would hold that a counterclaim will not be denied treatment as a compulsory counterclaim merely because entitlement to relief depends on the outcome of the main action. If we were to apply this rule here, the Lutzes would have been required to assert an easement-by-necessity counterclaim a decade ago, thus saving the parties and the courts substantial resources, both in time and money. Application of the above rule best effectuates judicial economy, fairness, and convenience.

*4. The Lutzes' easement-by-necessity claim was mature in 2006*

In 2006, when the Lutzes answered Ms. Buffington's original complaint, the publicly recorded instruments established that Ponderosa Pines, Inc. did not own lot 82 in late 1996 when it attempted to convey an express easement across that lot to the Lutzes. The Lutzes thus should have known that they had no legal access to their property. *See Strong v. Clark*, 56 Wn.2d 230, 232, 352 P.2d 183 (1960) ("When an instrument involving real property is properly recorded, it becomes notice to all the world of its contents."). The majority's determination that the Lutzes' claim was not mature because they did not know that their property was landlocked until after the first action ended, is inconsistent with the facts publicly available in 2006. Instead, the Lutzes should have known in 2006 that they had no legal access across lot 82 and should have asserted their easement-by-necessity claim. The need to interpose the claim was obvious in 2006.

For the reasons expressed above, I dissent.

Lawrence-Berrey, J.

9